United States Court of Appeals,

Eleventh Circuit.

No. 95-6326.

Bruce LUCERO, M.D., New Woman All Woman Health Care, Plaintiffs-Appellees-Cross-Appellants,

v.

David TROSCH, Father, Defendant,

Minzor Chadwick, David Lackey, Kathleen McConnell, John Edwin Williams, Eleanor Stisher, Defendants-Appellants-Cross-Appellees,

Chris Harding, Deputy United States Marshal, Movant.

Sept. 8, 1997.

Appeals from the United States District Court for the Northern District of Alabama. (No. CV-95-PT-188-S), Robert B. Propst, Judge.

Before ANDERSON and COX, Circuit Judges, and RONEY, Senior Circuit Judge.

ANDERSON, Circuit Judge:

This abortion protest case comes to us on an appeal of the district court's order granting, in part, plaintiffs' application for a preliminary injunction. Plaintiffs Dr. Bruce Lucero and New Woman All Women Health Care brought this action against several abortion protesters under the Freedom of Access to Clinic Entrances Act of 1994 ("FACE"), 18 U.S.C.A. § 248. Plaintiffs also raised supplemental state law claims under Alabama nuisance law. *See* Ala.Code § 6-5-120 *et seq.* The district court denied plaintiffs' application for a preliminary injunction on the FACE claim, but granted their application for a preliminary injunction on the nuisance claim. Both parties appealed. The following issues are raised on appeal: (1) whether the district court abused its discretion in failing to dismiss plaintiffs' state law nuisance claim after the court denied plaintiffs' application for a preliminary injunction on their federal FACE claim; (2) whether the district court abused its discretion in issuing the preliminary injunction on the basis of plaintiffs' Alabama nuisance claim;

and (3) whether the preliminary injunction unconstitutionally infringes on the protesters' First Amendment rights.[1] We affirm in part, vacate in part, and remand this case to the district court.

## I. FACTS

Dr. Lucero is a doctor who performed various reproductive health services, including abortions, at the New Woman All Women Health Care clinic ("the Clinic") in Birmingham, Alabama. In his complaint, he alleged that defendants Minzor Chadwick, David Lackey, Kathleen McConnell, John Edwin Williamson, and Eleanor Stisher (collectively "defendants") exceeded the bounds of lawful protest in their opposition to abortion.[2] Plaintiffs seek injunctive relief and monetary damages.

The conduct of defendants which gave rise to the preliminary injunction can be broken down into several functional categories.[3] First, defendants regularly protested outside the Clinic. They began their protests at the Clinic's previous location and continued when it moved to its present location.[4] Defendants generally positioned themselves in front of the Clinic and persistently voiced religious appeals to the Clinic's staff and patients. They often shouted in voices loud enough to be heard inside the Clinic. The district court found that defendants' shouting created unwarranted and disturbing noises during periods of surgery inside the Clinic.

Second, defendants delayed patients arriving in cars in defendants' attempts to foist literature on the patients. For example, the district court found that defendant Chadwick would, on occasion,

---

[1]We do not address plaintiffs' cross-appeal challenging the district court's denial of their application for a preliminary injunction on the FACE claim. A preliminary injunction under FACE would be no broader than the preliminary injunction issued on the nuisance claim because the two claims derive from the same underlying facts. Accordingly, plaintiffs have their remedy—i.e., the preliminary injunction—and we decline to address their argument that the district court should have also issued a preliminary injunction based on their FACE.

[2]Although David Trosch was initially named in the complaint, the district court severed the claim against him and transferred venue to the Southern District of Alabama.

[3]Neither party challenges the district court's findings of fact; thus we briefly summarize these findings in what follows.

[4]The Clinic was relocated to its present location in August 1994. Dr. Lucero testified that he was evicted from his former location as a result of defendants' actions.

2

hold up his hand and signal for cars to stop. If the car's occupant objected, Chadwick would move out of the way, but only after he had caused a delay. The district court specifically found that much of this conduct was disturbing to the Clinic's staff and patients. Further, the court found that defendants' conduct, both with respect to patients arriving by foot and by car, left several patients in tears and delayed their entries into the Clinic.

Third, the district court found that defendants had protested at Dr. Lucero's house. According to Dr. Lucero, these residential protests were quite loud and caused him to feel intimidated. Similarly, the district court found that defendants had, on occasion, followed Clinic staff members home and attempted to explain their religious objections to the Clinic's work. On at least one occasion, a defendant followed a Clinic staff member inside her apartment building to its security elevator.

Finally, the district court highlighted two incidents. First, it found that defendant Lackey told Mrs. Lucero, Dr. Lucero's wife: "Now that we know where you live, we will return." Lackey may have also suggested that Mrs. Lucero should feel scared because of his return, but the district court noted that it was unable to make a finding of fact as to such statement. Second, the district court stated: "The primary incident involving [defendant] Williamson is one related to blocking of Dr. Lucero as he attempted to leave the clinic. The court cannot determine the truth of this situation from the evidence." The district court found that this incident "caused a conflict and could have resulted in injury to one or more of the participants."

With respect to all of its factual determinations, the court found that defendants' conduct consistently and repeatedly inconvenienced patients and staff members and that defendants' conduct was harassing and materially annoying. The court found that defendants' conduct constituted a nuisance (District Court Opinion at 16). It could not find, however, that defendants had used force or threat of force. (*Id.* at 11-12). Although the court concluded that each defendant had slightly restricted the freedom of movement of Clinic patients and staff, it could not find that defendants had "physically obstructed" them. (*Id.* at 12).

3

After the two-day hearing, the district court issued a preliminary injunction as to the nuisance claim, stating that the court had considered the Supreme Court's guidance in *Madsen v. Women's Health Center, Inc.,* 512 U.S. 753, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994). The preliminary injunction is reproduced in the appendix to this opinion. However, the district court denied plaintiffs' application for a preliminary injunction on the FACE claim on the ground that they failed to demonstrate a substantial likelihood of success on the merits. This appeal ensued.

After oral argument had been heard in this appeal, it came to this court's attention that Dr. Lucero had sold the Clinic and that he and his family are no longer living in Alabama. In light of these developments, this court *sua sponte* raised the issue of the possible mootness of the claim for injunctive relief and requested supplemental briefing from the parties. This supplemental briefing revealed considerable confusion on the issue of mootness, including confusion about what type of corporate entity New Woman All Women Health Care is and whether the entity is a party to this lawsuit. Because of this confusion, we ordered a limited remand to the district court for the purpose of conducting an inquiry into the possibility that the claim for injunctive relief is moot.

On remand, the district court conducted a hearing at which some critical facts were established; however, the district court did not resolve the mootness issues.[5] Instead, the district court made the following findings of fact. This lawsuit was initiated by Bruce Lucero, M.D., as an individual, and by "New Woman All Women Health Care." Bruce A. Lucero, M.D.P.C., Dr. Lucero's professional corporation, was doing business as New Woman All Women Health Care, but was not a party to this lawsuit. The business name "New Woman All Women Health Care" is stated in the complaint as a party plaintiff to this action, but as a legal entity, it is not a party plaintiff. Dr. Lucero and his immediate family no longer reside in Alabama, nor do they own or operate the entity known as New Woman All Women Health Care. Bruce A. Lucero, M.D.P.C., sold all of the assets

---

[5]The parties convinced the district court judge that the purpose of the remand was merely to make factual findings, not to resolve the mootness issues.

4

of the entity operated as New Woman All Women Health Care to All Women's, Inc., a corporation, on October 1, 1996, approximately six months after oral argument had been heard in this appeal.

The evidence presented to the district court revealed that the president and majority shareholder of All Women's, Inc. is Ms. Diane Derzis. Derzis testified at the hearing that All Women's, Inc. has continued to operate the Clinic under the name "New Woman All Women Health Care." She further testified that All Women's, Inc. bought all of the assets of the entity that Bruce A. Lucero, M.D.P.C., operated as New Woman All Women Health Care, including the business' name and goodwill. Derzis testified that the Clinic continues to provide abortion services at the same location and employs many of the same employees, although there are different doctors providing the abortion services. Derzis testified that the protections of the preliminary injunction issued by the district court were "central" to her decision that All Women's, Inc. should buy the entity operated as New Woman All Women Health Care. She explained in her testimony that she believed that New Woman All Women Health Care, as a legal entity, was a party to this lawsuit.

## II. DISCUSSION

A. *Effect of Dr. Lucero's Sale of the Clinic*

Because Dr. Lucero and his family no longer reside in Alabama and no longer own or operate the Clinic, any claims for injunctive relief are moot as to them. However, Dr. Lucero's claim for monetary damages is not moot. *See Deakins v. Monaghan,* 484 U.S. 193, 201-202, 108 S.Ct. 523, 529, 98 L.Ed.2d 529 (1988); *University of Texas v. Camenisch,* 451 U.S. 390, 397-398, 101 S.Ct. 1830, 1835, 68 L.Ed.2d 175 (1981); *McKinnon v. Talladega County,* 745 F.2d 1360, 1362 (11th Cir.1984); *Forbes v. Arkansas Educ. Television Communication Network Found.,* 982 F.2d 289, 290 (8th Cir.1992).

Although there has been no formal joinder of All Women's, Inc. (the new owner of New Woman All Women Health Care) as a party plaintiff, the testimony of Ms. Diane Derzis before the district court makes it clear that she understood that All Women's, Inc. was buying the entire business operated as New Woman All Women Health Care, including goodwill and the use of the

business' name.  She also believed that New Woman All Women Health Care was a party to this lawsuit.  It is clear that the protection of the injunction issued by the district court was an important factor in persuading Derzis that All Women's, Inc. should buy New Woman All Women Health Care.

We conclude that when an injunction protects a party plaintiff from interference with his business, and when the plaintiff sells all of the assets of the business while the litigation in question is pending, with the business' location and employees remaining substantially the same, and with the services provided continuing uninterrupted and substantially unchanged, the new owner of the business can be joined as a party plaintiff and continue to receive the protections of the injunction. *See* Fed.R.Civ.P. 17(a), 25(c);[6] *see also Killebrew v. Moore,* 41 F.R.D. 269 (N.D.Miss.1966). *See generally* 6 Moore's *Federal Practice* § 25.30 (3d ed.1997);  7C Charles Alan Wright et al., *Federal Practice and Procedure* § 1958 (2d ed.1986).  *Cf. Virgo v. Riviera Beach Assocs., Ltd.,* 30 F.3d 1350, 1357-58 (11th Cir.1994);  *Natural Resources Defense Council, Inc. v. Texaco Ref. and Mktg.,*

_____

[6]Rule 17(a) provides in pertinent part:

Rule 17. Parties Plaintiff and Defendant;  Capacity

(a) Real Party in Interest.  Every action shall be prosecuted in the name of the real party in interest.  ....  No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest;  and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

Fed.R.Civ.P. 17(a).  Rule 25(c) provides:

Rule 25. Substitution of Parties.

...

(c) Transfer of Interest.  In case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party.  Service of the motion shall be made as provided in subdivision (a) of this rule.

Fed.R.Civ.P. 25(c).

6

*Inc.,* 2 F.3d 493, 506 (3d Cir.1993). Therefore, the claim for injunctive relief is not moot (except as to Dr. Lucero and his family), and, on remand, All Women's, Inc. should be joined to this lawsuit as a party plaintiff pursuant to the apparent desire of its principal.[7]

B. *Supplemental Jurisdiction*

Defendants argue that the district court erred in continuing to exercise supplemental jurisdiction over plaintiffs' state law claim after the court refused to issue a preliminary injunction on plaintiffs' FACE claim. The supplemental jurisdiction statute provides, in relevant part:

> (a) Except as provided in subsections (b) and (c) ..., in any civil action of which district courts shall have original jurisdiction, the district court shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.
>
> ...
>
> (c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—
>
> > (1) the claim raises a novel or complex issue of State law,
> >
> > (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> >
> > (3) the district court has dismissed all claims over which it has original jurisdiction, or
> >
> > (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C.A. § 1367.[8] The statute reflects a dichotomy between a federal court's *power* to exercise supplemental jurisdiction, § 1367(a), and its *discretion* not to exercise such jurisdiction, § 1367(c). *See Palmer v. Hosp. Auth. of Randolph County,* 22 F.3d 1559, 1563 (11th Cir.1994); *see also Myers v. County of Lake, Indiana,* 30 F.3d 847, 849 (7th Cir.) ("Section 1367 divides into stages the identification of pendent claims suitable for federal adjudication."), *cert. denied,* 513 U.S. 1058, 115

---

[7]Because Dr. Lucero's damages claim is not moot, All Women's, Inc. should be joined as a party plaintiff, rather than substituted as a party plaintiff.

[8]Section 1367(b) is not applicable in this case.

7

S.Ct. 666, 130 L.Ed.2d 600 (1994). Subsection (a) of § 1367 establishes the district court's *power* to exercise supplemental jurisdiction over all supplemental claims which form part of the same "case or controversy" under Article III of the Constitution. *Palmer,* 22 F.3d at 1566 ("By its language, section 1367(a) authorizes a court to hear supplemental claims to the full extent allowed by the "case or controversy' standard of Article III."). The constitutional "case or controversy" standard confers supplemental jurisdiction over all state claims which arise out of a common nucleus of operative fact with a substantial federal claim. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 724-25, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966); *Palmer,* 22 F.3d at 1563-64 (a federal court has the power under § 1367(a) to exercise pendent jurisdiction over state claims which arise from the same occurrence and involve the same or similar evidence); *L.A. Draper and Son v. Wheelabrator-Frye, Inc.,* 735 F.2d 414, 427 (11th Cir.1984) (a federal court may exercise pendent jurisdiction over state law claims deriving from a common nucleus of operative fact with a substantial federal claim). *See also Lyon v. Whisman,* 45 F.3d 758, 760 (3d Cir.1995) (noting that § 1367 incorporates the constitutional analysis of *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)); Charles Alan Wright, Law of Federal Courts, at 37 n. 20 (5th ed.1994). A federal court's power or jurisdiction to entertain supplemental state claims is ordinarily determined on the pleadings. *See Gibbs,* 383 U.S. at 728-29, 86 S.Ct. at 1139-40; *Draper,* 735 F.2d at 427. We readily conclude that the allegations of the complaint in this case satisfy the substantiality requirement with respect to the federal FACE claim. Indeed, the district court also held that plaintiffs' federal claim "is not insubstantial." We also readily conclude that plaintiffs' state law nuisance claim and their FACE claim derive from a common nucleus of operative facts. These claims rely on the identical actions of defendants.[9]

Having determined that the district court had the power or jurisdiction under § 1367(a) to entertain the supplemental nuisance claim, we turn to the second part of the analysis under §

---

[9]In their briefs on appeal, defendants do not argue that the federal claim is insubstantial or that the state claim arises out of different underlying facts.

1367—i.e., the district court's discretionary authority to dismiss supplemental claims under § 1367(c). We pause to note that the record on appeal indicates that defendants did not raise any issues relating to supplemental jurisdiction in the district court. We have addressed and resolved the power or jurisdiction of the district court under § 1367(a) notwithstanding the defendants' failure to raise this issue in the district court because the court's power to hear and decide a claim under § 1367(a), i.e., subject matter jurisdiction, is an issue which may be raised at any time by the parties and should be raised *sua sponte* by the court. *See Barnett v. Bailey,* 956 F.2d 1036, 1039 (11th Cir.1992); *see also Myers,* 30 F.3d at 849-50 ("A court must satisfy itself that a claim falls within the category laid out in § 1367(a), for otherwise there is no federal jurisdiction."). However, with respect to § 1367(c), the only issue which we could address is whether the district court abused its discretion in taking supplemental jurisdiction of the Alabama nuisance claim. *See Chandler v. Miller,* 73 F.3d 1543, 1546 n. 3 (11th Cir.1996) (noting that the district court's decision under § 1367(c) to retain supplemental jurisdiction over state law claims is reviewed for an abuse of discretion), *rev'd on other grounds,* --- U.S. ----, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997). In this case, the district court was not asked to exercise its discretion, and thus did not discuss the matter. It would be difficult for us to review the issue in this context. *See Narey v. Dean,* 32 F.3d 1521, 1526 (11th Cir.1994) ("[A]ppellate courts generally will not consider an issue or theory that was not raised in the district court."). In this context, we do not so readily overlook the defendants' failure to present their § 1367(c) arguments to the district court. As a practical matter, the district court is in the best position to weigh the competing interests set forth in § 1367(c) and *Gibbs* in deciding whether it is appropriate to exercise supplemental jurisdiction. While we can and will review such decisions, the discretion is appropriately vested in the district court, and should be exercised by the district court in the first instance. *See Palmer,* 22 F.3d at 1570 ("[T]he discretionary aspects of the exercise of [supplemental] jurisdiction are best left to the district court in the first instance."). Because they were raised for the first time on appeal, we decline to consider defendants' arguments that the district court erred in failing to exercise its discretion to dismiss the state claims. *Cf.*

9

*Schenck v. Pro-Choice Network,* --- U.S. ----, ----, 117 S.Ct. 855, 863, 137 L.Ed.2d 1 (1997) (noting that the district court in that case exercised pendent jurisdiction over state law claims after dismissing the only federal claim). Although we would ordinarily exercise our discretion to entertain an argument raised for the first time on appeal if our refusal to do so would result in a miscarriage of justice, *see Narey,* 32 F.3d at 1526-27, we are confident in this case that the interests of justice do not require that we do so.

C. *The Preliminary Injunction—Alabama Nuisance Law and the First Amendment*

Defendants mount several challenges to the preliminary injunction issued on plaintiffs' nuisance claim. We review the district court's issuance of a preliminary injunction for an abuse of discretion. *Gold Coast Publications, Inc. v. Corrigan,* 42 F.3d 1336, 1343 (11th Cir.1994), *cert. denied,* --- U.S. ----, 116 S.Ct. 337, 133 L.Ed.2d 236 (1995); *Tally-Ho, Inc. v. Coast Community College Dist.,* 889 F.2d 1018, 1022 (11th Cir.1989). Although we review factual findings for clear error, *Tally-Ho, Inc.,* 889 F.2d at 1022, we review the district court's legal determinations *de novo, Church v. City of Huntsville,* 30 F.3d 1332, 1341-42 (11th Cir.1994).

A preliminary injunction will issue if the movant demonstrates: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction were not granted; (3) that the threatened injury to the plaintiff outweighs the harm an injunction may cause to the defendant; and (4) that granting the injunction would not disserve the public's interest." *Church,* 30 F.3d at 1342; *see also Gold Coast Publications,* 42 F.3d at 1343. Defendants focus their attack on the "substantial likelihood of success on the merits" requirement.

Under Alabama law:

> A nuisance is anything that works hurt, inconvenience or damage to another. The fact that the act done may otherwise be lawful does not keep it from being a nuisance. The inconvenience complained of must not be fanciful or such as would affect only one of a fastidious taste, but it should be such as would affect an ordinary reasonable man.

10

Ala.Code § 6-5-120.[10] *See also Tipler v. McKenzie Tank Lines,* 547 So.2d 438, 440 (Ala.1989) (a nuisance "may consist of conduct that is intentional, unintentional, or negligent"); *Terrell v. Alabama Water Serv. Co.,* 245 Ala. 68, 15 So.2d 727 (1943); *Chambers v. Summerville United Methodist Church, Inc.,* 675 So.2d 1315 (Ala.Civ.App.1996). A private nuisance is one that is "limited in its injurious effects to one or a few individuals." Ala.Code § 6-5-121. Further, the term "nuisance" under Alabama law involves the idea of a recurrence of acts causing injury. *Banks v. Corte,* 521 So.2d 960, 961 (Ala.1988).

The district court found that "the conduct of each of the defendants has proximately caused and worked hurt, inconvenience and damage to the plaintiffs," (District Court Opinion at 15), "is a nuisance," (*id.* at 16), and "will likely continue if not enjoined," (*id.* at 17). In short, the district court found that defendants' conduct violates the nuisance law because it is harassing and "substantially interferes" with plaintiffs' lawful activities on the Clinic's premises.

Although at one point in defendants' brief they say that the district court improperly applied Alabama law, the substantive arguments actually presented by defendants are only the following: (1) the injunction issued by the district court goes beyond remedying past or threatened (i.e., future) unlawful conduct—in other words, it is "non-remedial" and thus amounts to an unconstitutional prior restraint on free speech; and (2) the injunction is unconstitutional as applied[11] to defendants

---

[10]The definition in the Alabama Code is declaratory of the common law and does not supersede it as to circumstances constituting a nuisance. *Lauderdale County Bd. of Educ. v. Alexander,* 269 Ala. 79, 110 So.2d 911 (1959); *Park Ctr., Inc. v. Champion Int'l Corp.,* 804 F.Supp. 294, 302 (S.D.Ala.1992). Accordingly, this court is free to apply common law cases.

[11]Defendants do not purport to mount a facial challenge to the Alabama nuisance statute.

11

in that it burdens more speech than is necessary to serve significant government interests.[12]  We

address these two contentions in turn.

1. *Unconstitutional Prior Restraint*

Defendants argue that because the preliminary injunction does not remedy past or threatened

(future) unlawful conduct, it is non-remedial and amounts to an unconstitutional prior restraint on

free speech.  Because it is a prior restraint, defendants contend, the preliminary injunction should

be subject to "strict scrutiny" and the concomitant presumption against its constitutionality.  *See*

*Madsen v. Women's Health Ctr., Inc.,* 512 U.S. 753, 766, 114 S.Ct. 2516, 2525, 129 L.Ed.2d 593

(1994).  Their theory derives from Justice Scalia's concurrence in the Supreme Court's summary

denial of certiorari in *Lawson v. Murray,* 515 U.S. 1110, 115 S.Ct. 2264, 132 L.Ed.2d 269 (1995).

In his *Lawson* concurrence, Scalia argued that when courts cut injunctions loose from their remedial

moorings, they allow the injunctions to drift dangerously close to unconstitutional prior restraints:

> All speech-restricting injunctions are prior restraints in the literal sense of " "administrative
> and judicial orders forbidding certain communications when issued in advance of the time
> that such communications are to occur.' "  [Cit.] Precedent shows that a speech-restricting

---

[12]Vague language in defendants' brief suggests the possibility that defendants are arguing that the Alabama nuisance laws are simply inapplicable when First Amendment concerns are involved.  We reject any such argument.  *See Sweeton II,* 366 So.2d 710, 713 (Ala.1979) (affirming an injunction of a nuisance in the context of First Amendment concerns).

Defendants fail to make any other coherent argument as to how the district court misapplied Alabama nuisance law.  To make out a nuisance claim under Alabama law, a plaintiff must show that the defendant had a duty the breach of which caused the hurt, inconvenience, or damage of which the plaintiff complains.  In this case, defendants have failed to argue that the district court erred in its conclusion that they violated the nuisance law except to say that this case involves the First Amendment and that there was no prior or threatened future unlawful act.  Accordingly, we will not review the district court's interpretation of Alabama nuisance law as it relates to the formal application of the elements of a nuisance (i.e., duty, breach, causation, damage) to this case.  *See Cheffer v. Reno,* 55 F.3d 1517, 1519 n. 1 (1995) (issues not argued in brief deemed abandoned); Fed. R.App. P. 28(a)(6).

Defendants do argue that the injunction violates Alabama's constitutional right of free speech and Alabama's overbreadth doctrine.  However, we need not separately address these arguments because defendants do not suggest that the substance of their arguments is different from the arguments listed in the text or that the relevant analysis under the Alabama Constitution is any different from that employed by the Supreme Court in *Madsen.*

12

"injunction" that is not issued as a *remedy* for an adjudicated or impending violation of law is also a prior restraint in the condemnatory sense, that is, a prior restraint of the sort prohibited by the First Amendment.... The danger that speech-restricting injunctions may serve as a powerful means to suppress disfavored views is obvious enough even when they are based on a completed or impending violation of law. Once such a basis has been found, later speech may be quashed, or not quashed, in the discretion of a single official, who necessarily knows the content and viewpoint of the speech subject to the injunction; the injunction is enforceable through civil contempt, a summary process without the constitutional protection of a jury trial; and the only defense available to the enjoined party is factual compliance with the injunction, *not* unconstitutionality....

Lawson, 515 U.S. at 1113, 115 S.Ct. at 2266 (Scalia, J., concurring).

We need not address this argument, however, because we have carefully adhered to the principle that injunctions must be remedial. *Cf. id.* at 1111-12, 115 S.Ct. at 2265. As the Court in *Madsen* recognized, "[i]njunctions ... are remedies imposed for violations (or threatened violations) of a legislative or judicial decree." *Madsen,* 512 U.S. at 764, 114 S.Ct. at 2524.[13]

The Supreme Court in *Madsen* rejected a prior restraint argument similar to the one asserted by defendants in this case, holding:

Not all injunctions which may incidentally affect expression, however, are "prior restraints" in the sense that that term was used in *New York Times Co.* [v. *United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) ], or *Vance* [v. *Universal Amusement Co.,* 445 U.S. 308, 100 S.Ct. 1156, 63 L.Ed.2d 413 (1980) (per curiam) ]. Here petitioners are not prevented from expressing their message in any one of several different ways; they are simply prohibited from expressing it within the 36-foot buffer zone. Moreover, the injunction was issued not because of the content of petitioners' expression, as was the case in *New York Times Co.* and *Vance,* but because of their prior unlawful conduct.

*Madsen,* 512 U.S. at 763 n. 2, 114 S.Ct. at 2524 n. 2. We discuss the *Madsen* context in detail below. Suffice it to say at this point that the context in *Madsen* is not distinguishable in principle from the instant context. In both cases, the trial court had made a judicial determination that the defendants'

---

[13]Although portions of the injunction approved by the district court may indeed be broader than the proper scope as determined in light of *Madsen* and *Schenck, see infra* Part II.C.2, we readily conclude that the injunction as modified by this opinion is remedial, is supported by the evidence in this record, and the issuance thereof entails no abuse of discretion on the part of the district court. We also reject defendants' suggestion that the injunction prohibits conduct different than defendants' past conduct. For example, although defendants may not have used bullhorns or other sound amplification equipment, their shouting loud enough to be distracting inside the Clinic is sufficiently similar in kind. It defies common sense to say that the court can enjoin the shouting, but not bullhorns, and require plaintiffs to seek another injunction if defendants switch media.

past conduct was harassing and unlawful. *See Madsen,* 512 U.S. at 757-58, 763-65, 114 S.Ct. at 2521, 2524; *see also Schenck,* --- U.S. at ---- n. 6, 117 S.Ct. at 865 n. 6. Although defendants in this case argue that their past conduct was not unlawful, the district court clearly found otherwise.[14] After summarizing defendants' past conduct, the district court concluded: "The conduct of the defendants is a nuisance."[15] On the basis of *Madsen,* we readily conclude that the instant preliminary injunction, as modified in this opinion, does not constitute a prior restraint.

2. *Whether the Preliminary Injunction Burdens More Speech than Necessary to Serve Significant Government Interests*

a. *Madsen v. Women's Health Center, Inc.*

Defendants rely on the Supreme Court's decision in *Madsen v. Women's Health Center, Inc.,* 512 U.S. 753, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994), to argue that the preliminary injunction unconstitutionally abridges their First Amendment rights. Because the Court in *Madsen* set forth a new standard by which to judge First Amendment challenges to injunctions, and because *Madsen* arose in a similar factual context, we pause to examine that case in some detail.

*Madsen* arose out of abortion protest activities in Florida. A Florida state court permanently enjoined the defendant protesters from blocking or interfering with public access to the clinic and from physically abusing people entering or leaving the clinic. Six months later, plaintiffs sought to broaden the injunction when the protesters continued their unlawful conduct. The Florida trial court found that the protesters had impeded access to the clinic by congregating on the street leading up to the clinic and by marching up to the clinic's driveways. It found that as vehicles heading toward the clinic slowed to allow the protesters to move out of the way, "sidewalk counselors" would

---

[14]*See infra* Part II.C.2(c), for a more detailed discussion of defendants' prior unlawful conduct.

[15]The Supreme Court in *Madsen* noted that an injunction can issue upon a showing that the defendant either has violated or immediately will violate some provision of statutory or common law. *Madsen,* 512 U.S. at 765 n. 3, 114 S.Ct. at 2524 n. 3. The district court in this case clearly found that defendants' past conduct had already violated the Alabama nuisance laws, and would likely continue if not enjoined. Thus, in this case, we do not have a mere threat of a future violation.

14

approach and attempt to disburse anti-abortion literature. The number of people outside the clinic varied from "a handful" to 400, and their volume varied from singing and chanting to the use of loudspeakers and bullhorns. The court found that these protests took a physical toll on the clinic's patients. *See Madsen,* 512 U.S. at 757-58, 114 S.Ct. at 2521. Doctors and clinic workers were also picketed at their residences and generally harassed. *Id.*[16]

In *Madsen,* the abortion protesters first argued that because the injunction only restricted the speech of anti-abortion protesters, it necessarily was content- or viewpoint-based. *Id.* at 761-63, 114 S.Ct. at 2523. The Court explicitly rejected this argument on the ground that an injunction, by its very nature, applies only to a particular group or to individuals. *Id.* The "principal inquiry in determining content neutrality is whether the government has adopted a regulation of speech "without reference to the content of the regulated speech.' " *Id.* (citations omitted). In *Madsen,* the trial court had not enjoined actors on the basis of their speech, but rather on the basis of their conduct. *Id.* at 763-65, 114 S.Ct. at 2524. Thus, because the injunction was not content-based, it was not subject to heightened scrutiny.[17] *Id.*

---

[16]The Florida Supreme Court upheld the constitutionality of the injunction. *Madsen,* 512 U.S. at 759-61, 114 S.Ct. at 2522. A panel of this Court, however, struck down the same injunction, characterizing the dispute as a clash "between an actual prohibition of speech and a potential hinderance to the free exercise of abortion rights." *Cheffer v. McGregor,* 6 F.3d 705, 711 (11th Cir.1993), *vacated,* 41 F.3d 1421 (11th Cir.), *remanded,* 41 F.3d 1422 (11th Cir.1994) (en banc). The Supreme Court granted certiorari in *Madsen* to resolve the conflict between the Florida Supreme Court and this circuit. *Madsen,* 512 U.S. at 761-63, 114 S.Ct. at 2523.

[17]Defendants in this case argue that the preliminary injunction is content-based because it "disfavors lawful speech against abortion" at the Clinic and because only abortion protesters were enjoined. *Madsen* rejected an identical argument:

> That [defendants] all share the same viewpoint regarding abortion does not in itself demonstrate that some invidious content- or viewpoint-based purpose motivated the issuance of the order. It suggests only that those in the group *whose conduct* violated the court's order happen to share the same opinion regarding abortions being performed at the clinic.

*Madsen,* 512 U.S. at 763-65, 114 S.Ct. at 2524. *See also Vittitow v. City of Upper Arlington,* 43 F.3d 1100, 1104 (6th Cir.), *cert. denied,* 515 U.S. 1121, 115 S.Ct. 2276, 132 L.Ed.2d 280 (1995). This case is also like *Madsen* in that there is no indication in this record that the district court's purpose was to regulate defendants' speech because of a disagreement with their message. *See National Org. for Women v. Operation Rescue,*

Turning to the injunction, the Court in *Madsen* developed a new standard for evaluating content-neutral injunctions. The Court noted that the constitutionality of content-neutral, generally applicable statutes is typically assessed under the standards set forth in *Ward v. Rock Against Racism,* 491 U.S. 781, 791-92, 109 S.Ct. 2746, 2753-54, 105 L.Ed.2d 661 (1989), and similar cases. Because the areas surrounding clinics are typically traditional public fora, these cases require that time, place, and manner regulations be "narrowly tailored to serve a significant governmental interest." *Madsen,* 512 U.S. at 764, 114 S.Ct. at 2524. However, injunctions carry a greater risk of restricting speech than generally applicable statutes because injunctions apply only to the person whose prior unlawful conduct prompted the injunction. Accordingly, the Court determined that the standard time, place, and manner analysis was not sufficiently rigorous. *Id.* at 763-67, 114 S.Ct. at 2524-25. Instead, the Court adopted a new, purposefully stricter standard: whether the challenged provisions of the injunction "burden no more speech than necessary to serve a significant government interest." *Id.* at 765, 114 S.Ct. at 2525.

The Court in *Madsen* readily found that numerous significant government interests were protected by the injunction in that case. These included the State's interest in: (1) protecting a woman's freedom to seek lawful medical or counseling services in connection with her pregnancy; (2) ensuring public safety and order, promoting the free flow of traffic on public streets and sidewalks, and protecting the property rights of all citizens; (3) ensuring residential privacy; and (4) analogously, protecting "captive" patients from targeted picketing. *Id.* at 767-69, 114 S.Ct. at 2526. Accordingly, the Court examined each contested provision of the injunction to determine whether it burdened more speech than necessary to serve these significant government interests.

First, the trial court had enjoined the protesters from "congregating, picketing, patrolling, demonstrating or entering any portion of the public right-of-way or private property within 36 feet of the property line of the clinic." *Id.* The Court held that the buffer zone on public property was no more broad than necessary to protect unfettered passage to and from the clinic and to ensure that

37 F.3d 646, 655 (D.C.Cir.1994).

16

the protesters did not block traffic on the adjoining road.[18]  *Id.* at 769-71, 114 S.Ct. at 2527.  As to the private property, the Court noted that patients and staff attempting to reach the clinic did not have to traverse private property abutting the clinic and that nothing in the record indicated that the protesters' activity on the private property obstructed access to the clinic.  *Id.* at 771-73, 114 S.Ct. at 2528.  Absent such evidence, the Court held that this portion of the buffer zone burdened more speech than necessary to protect access to the clinic.  *Id.*

Second, the injunction restrained the protesters from "singing, chanting, whistling, shouting, yelling, use of bullhorns, auto horns, sound amplification equipment, or other sounds or images observable to or within earshot of the patients inside the [c]linic" during the hours of 7:30 a.m. through noon on Mondays through Saturdays.  *Id.*  The Court held that the noise restrictions burdened no more speech than necessary to ensure the health and well-being of patients at the clinic. *Id.*  In so holding, the Court noted that it had taken into account the place to which the restriction applied in determining whether the restriction burdened more speech than necessary; to-wit:  "The First Amendment does not demand that patients in a medical facility undertake Herculean efforts to escape the cacophony of political protests."  *Id.*

Third, as noted, the injunction also restrained the protesters from projecting "images observable" (i.e., signs) outside the clinic.  The Court held that this prohibition burdened more speech than necessary to achieve the purpose of limiting threats to clinic patients or their families. *Id.* at 773-75, 114 S.Ct. at 2529.  It so held on the grounds that patients inside the clinic could easily avoid these images by pulling the curtains on the clinic's windows.  *Id.*

Fourth, the injunction ordered that the protesters refrain from physically approaching people seeking the clinic's services "unless such person indicates a desire to communicate" in an area within 300 feet of the clinic.  *Id.*  The Court held that this provision burdened more speech than necessary to prevent intimidation and to ensure access to the clinic because it prohibited *all* uninvited

---

[18]The Court noted that the failure of the first injunction to accomplish its purpose could be taken into consideration in evaluating the constitutionality of the broader injunction.  *Madsen,* 512 U.S. at 769-71, 114 S.Ct. at 2527.

17

approaches of patients regardless of how peaceful the contact may be. *Id.* Before such approaches could be restrained, the Court required evidence that the protesters' speech was independently proscribable (e.g., fighting words or threats) or was otherwise indistinguishable from a threat of physical harm. *Id.*

Finally, the Court examined the injunction's restraint of "picketing, demonstrating, or using sound amplification equipment within 300 feet of the residences of clinic staff." The injunction also enjoined demonstrators from impeding access to streets which provided the sole access to streets on which those residences were located. *Id.* As to noise, the Court upheld the restriction on the same grounds it used to uphold noise outside the clinics. *Id.* As to the picketing, the Court found that the 300-foot zone was broader than necessary to protect particular residences given the evidence in that case. *Id.* at 775-77, 114 S.Ct. at 2530. It found that a smaller zone could have accomplished this result. *Id.* at 775-77, 114 S.Ct. at 2530.[19]

### b. *Schenck v. Pro-Choice Network*

In *Schenck v. Pro-Choice Network,* --- U.S. ----, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997), the Supreme Court addressed another challenge to an injunction in the abortion protest context, and reaffirmed the principles articulated in *Madsen.*[20] The abortion protesters enjoined in *Schenck* had engaged in a variety of activities, including blocking the plaintiff abortion clinics' driveways and entrances, disrupting clinic operations by entering the clinics, flinging themselves onto patients' cars, crowding cars approaching the clinics, and distributing literature to and conversing with patients approaching the clinics. *Id.* at ----, 117 S.Ct. at 860. The protesters also had used "more aggressive techniques," such as yelling in the faces of women approaching the clinics; jostling, grabbing,

---

[19]The Court noted that the 300-foot zone around the residences was much broader than the prohibition of "focused picketing taking place solely in front of a particular residence" the Court had found constitutional in *Frisby v. Schultz,* 487 U.S. 474, 483, 108 S.Ct. 2495, 2502, 101 L.Ed.2d 420 (1988). *Madsen,* 512 U.S. at 775-77, 114 S.Ct. at 2530. According to the Court, the 300-foot residential zone would ban general marching through residential neighborhoods—a ban unsupported by the record. *Id.*

[20]*Schenck* was decided after the district court had issued the preliminary injunction at issue in this case.

18

pushing, and shoving women attempting to enter the clinics; and elbowing, grabbing, and spitting on volunteers who escorted patients to the clinics. *Id.* Protesters called "sidewalk counselors" walked alongside women attempting to enter the clinics and tried to persuade the women not to have abortions; sometimes these efforts degenerated into physical altercations. *Id.*

The district court in *Schenck* issued an injunction which barred the protesters from demonstrating within a fixed 15-foot buffer zone around the clinic doorways, driveways, and parking lot entrances. The injunction also established 15-foot floating buffer zones around people and vehicles entering or leaving the clinic facilities. A "cease and desist" provision in the injunction allowed two sidewalk counselors to enter the buffer zones, but the sidewalk counselors were required to retreat 15 feet from the person they were counseling if the person indicated a desire not to be counseled. *See id.* at ---- - ---- & n. 3, 117 S.Ct. at 861-62 & n. 3.

The Court began its analysis by reviewing its *Madsen* decision, noting that the test to be applied when evaluating content-neutral injunctions is " "whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest.' " *Id.* at ----, 117 S.Ct. at 864 (quoting *Madsen,* 512 U.S. at 765, 114 S.Ct. at 2525). The Court explained that the injunction at issue protected the same significant government interests as were implicated in *Madsen:* ensuring public safety and order, promoting the free flow of traffic on public sidewalks and streets, protecting property rights, and protecting women's freedom to obtain pregnancy-related services. *Id.* at ----, 117 S.Ct. at 866. The Court then turned to an examination of the challenged portions of the injunction.

The Court struck down the 15-foot floating buffer zones around people approaching the clinics because the floating buffer zones burdened more speech than was necessary to serve the relevant government interests. *Id.* at ---- - ----, 117 S.Ct. at 866-67. The Court explained that the floating buffer zones prevented protesters from engaging in speech which "lie[s] at the heart of the First Amendment," such as having a normal conversation with people entering or leaving the clinics or handing leaflets to people entering or leaving the clinics who are walking on the public sidewalks.

*Id.* at ----, 117 S.Ct. at 867. Additionally, the "floating" nature of the buffer zones made it difficult for protesters who wished to be in compliance with the injunction to know how to do so because the protesters would have to continually readjust their positions as numerous people entered and exited the clinics. *Id.* at ---- & n. 9, 117 S.Ct. at 867 & n. 9. The floating buffer zones thus created impermissible uncertainty about what activity was allowed under the injunction, and created a substantial risk that more speech would be burdened than the injunction actually prohibited. *Id.* at ---- - ----, 117 S.Ct. at 867-68.[21]

The Court, however, upheld the 15-foot fixed buffer zones around clinic doorways, driveways, and parking lot entrances. *Id.* at ----, 117 S.Ct. at 868. The Court explained that these fixed buffer zones were necessary to ensure that people and vehicles could enter and exit the clinic facilities, and that the imposition of such fixed buffer zones was appropriate in light of the protesters' past conduct. *Id.* at ---- - ----, 117 S.Ct. at 868-69. The Court also noted that it would "defer to the District Court's reasonable assessment of the number of feet necessary to keep the entrances clear." *Id.* ----, 117 S.Ct. at 869.[22]

c. *Madsen and Schenck Applied to This Case*[23]

Defendants argue that this case and *Madsen* differ because the injunction in *Madsen* was based on prior unlawful acts. They argue that there was no prior unlawful conduct in this case, and that *Madsen* 's new standard for testing the constitutionality of content-neutral injunctions should be limited to those cases involving prior unlawful acts.

---

[21]The Court also struck down the 15-foot floating buffer zones around vehicles approaching and leaving the clinic facilities. *Id.* at ----, 117 S.Ct. at 868.

[22]The Court also upheld the "cease and desist" provision, as applicable to the fixed buffer zones, in light of the protesters' past conduct. *Id.* at ----, 117 S.Ct. at 870.

[23]Defendants' arguments that the injunction is overbroad and vague are subsumed within our discussion of the constitutionality of the preliminary injunction under *Madsen* and *Schenck. See National Org. for Women v. Operation Rescue,* 37 F.3d 646, 654 n. 1 (D.C.Cir.1994) (treating identical claims as a simple contention that the injunction is overinclusive).

The short answer to defendants' argument is that they are simply wrong in their assumption that there was no prior unlawful conduct in this case. As noted above, the district court, after summarizing defendants' prior conduct in this case, concluded that the harassing "conduct of the defendants is a nuisance." (District Court Opinion at 16). The record in this case supports the district court's conclusion.[24]

Defendants also argue that the preliminary injunction burdens more speech than necessary to serve significant government interests. The district court properly noted that the same significant government interests at issue in *Madsen* are at issue in this case, to-wit: a woman's freedom to seek lawful medical or counseling services in connection with her pregnancy, public safety and order, the free flow of traffic on public streets and sidewalks, and the property rights of citizens. *See Madsen,* 512 U.S. at 767-69, 114 S.Ct. at 2526; *see also Schenck,* --- U.S. at ----, 117 S.Ct. at 866.

In what follows, we examine each challenged provision of the preliminary injunction in light of *Madsen* and *Schenck* to determine whether the provision burdens more speech than necessary to serve the relevant government interests.[25]

---

[24]Defendants also suggest that the precedential value of *Madsen* is limited to cases in which the prior unlawful conduct is the violation of a previously issued injunction. Although it is clear that the need for an injunction is enhanced in such contexts, nothing in the holding or language of the *Madsen* opinion indicates that the prior unlawful conduct must entail violation of an injunction. In discussing the need for a more rigorous standard for evaluating injunctions,the Court specifically characterized injunctions as "remedies imposed for violations of a legislative or judicial decree." *Madsen,* 512 U.S. at 763-65, 114 S.Ct. at 2524. *See also id.* at 769-71, 114 S.Ct. at 2527 ("The failure of the first order to accomplish its purpose may be taken into consideration in evaluating the constitutionality of the broader order").

[25]We examine only those provisions of the injunction which defendants challenge. With respect to provisions of the injunction not discussed in this opinion, defendants' only argument is that the injunction is non-remedial. Given our disposition of this argument *supra,* we limit our discussion to the provisions with respect to which defendants raise other First Amendment concerns. Of course, all portions of the injunction, whether specifically discussed in this opinion or not, are vacated as moot to the extent that they are applicable to Dr. Lucero and his family.

    In addition to barring the named defendants from the actions described in the preliminary injunction, the preliminary injunction bars "any persons protesting against abortion" as well as "all other persons ... acting in concert ... with the defendants." Defendants argue that these provisions are too broad. Defendants, however, do not have standing to challenge these provisions because the provisions have no effect on them. *See Madsen,* 512 U.S. at 775-77, 114 S.Ct. at 2530 ("[Defendants] themselves are named

21

## (1) *Twenty-five foot buffer zone*

Paragraph (A)(3) of the preliminary injunction enjoins defendants from congregating, picketing, praying, loitering, patrolling, demonstrating or communicating with others orally, by signs, or otherwise, within 25 feet of the Clinic. Defendants attempt to analogize this provision to the "images observable" provision and the 300-foot buffer zone struck down in *Madsen.* To the contrary, this provision seems nearly identical to the 36-foot buffer zone upheld in *Madsen.* 512 U.S. at 767-71, 114 S.Ct. at 2526-27. The 25-foot buffer zone here would seem to be less intrusive on speech than the 36-foot buffer zone approved in *Madsen.* We believe the district court analyzed this issue in much the same manner as and within the contemplation of the *Madsen* analysis. *Compare* District Court Opinion at 18 n. 2 (observing "that 17th Street is relatively narrow and that reasonable communication of points of view can be made from the west side of 17th Street"), *with Madsen,* 512 U.S. at 769-71, 114 S.Ct. at 2527 (noting that the "buffer zone was narrow enough to place petitioners at a distance of no greater than 10 to 12 feet from cars approaching and leaving the clinic"). Furthermore, like the Supreme Court in *Schenck,* we will defer to the district court's "reasonable assessment" of the number of feet necessary to ensure that access to the Clinic is not impeded. *Schenck,* --- U.S. at ----, 117 S.Ct. at 869. As a matter of common sense, this provision does not seem unreasonable and does not burden more speech than necessary to preserve the patients', doctors', and staff's right to enter the Clinic. The defendants can still express their message, but they must stand more than 25 feet from the Clinic. *Cf. Madsen,* 512 U.S. at 763 n. 2, 114 S.Ct. at 2524 n. 2 ("Here petitioners are not prevented from expressing their message in any one of several different ways; they are simply prohibited from expressing it within the 36-foot buffer zone.").[26]

parties in the order, and they therefore lack standing to challenge a portion of the order applying to persons who are not parties.")

[26]Defendants make no argument in this case based on the Supreme Court's holding in *Madsen* that the 36-foot fixed buffer zone in that case could not be sustained with respect to the activities of the protesters on private property. *See Madsen,* 512 U.S. at 771-73, 114 S.Ct. at 2528. Accordingly, we decline to address any such argument.

(2) *200-foot Clinic and residential buffer zones*

Paragraph (A)(4), in relevant part, enjoins defendants from "approaching, congregating, picketing, patrolling, demonstrating, or using bullhorns or other sound amplification equipment within two hundred (200) feet of the [Clinic and staff residences]." At oral argument, plaintiffs conceded that the application of the fixed 200-foot buffer zone to the Clinic was a typographical error. The parties agreed that the 200-foot buffer zone was intended to apply only to the residences. Plaintiffs invited this court to modify paragraph (A)(4) to eliminate the 200-foot buffer zone with respect to the Clinic. We accept this concession and accordingly dissolve the 200-foot buffer zone around the Clinic.[27]

As discussed previously, Dr. Lucero and his family no longer reside in Alabama, nor do they own or operate the Clinic. As a result, we vacate this portion of the injunction as moot as to the Lucero residence.

Turning now to the 200-foot no approach buffer zone around the residences of the Clinic's staff,[28] we note that the Court in *Madsen* struck down the 300-foot generalized residential buffer zone because it was not sufficiently targeted. *Id.* at 773-77, 114 S.Ct. at 2529-30. It noted that a more focused restriction could have accomplished the same purpose. *Id.* at 775-77, 114 S.Ct. at 2530. The Court's discussion makes clear that its precedents support restriction of targeted picketing rather than a generalized restriction. *Id.* Like the 300-foot zone in *Madsen,* and for the same reasons,

---

[27]The context of the discussion at oral argument is not absolutely clear as to whether plaintiffs intended their concession to apply to the prohibition on the use of bullhorns or other sound amplification equipment, as well as the prohibition on approaching, congregating, picketing, patrolling and demonstrating. We have vacated the injunction so as to eliminate *entirely* the application of paragraph (A)(4) to the Clinic. The district court may, of course, in its discretion, reconsider any appropriate noise restrictions in the vicinity of the Clinic should it determine that the noise restrictions in paragraph (A)(8) are inadequate to serve the significant government interests.

[28]With respect to the application of paragraph (A)(4) to the residences, we vacate only the prohibition on approaching, congregating, picketing, patrolling and demonstrating. With respect to the prohibition on using bullhorns or other sound amplification equipment within 200 feet of the residences, we summarily reject defendants' challenge. *See Madsen,* 512 U.S. at 771-74, 114 S.Ct. at 2528-29.

23

the 200-foot no approach residential zone in this case is too broad. *See Kirkeby v. Furness,* 52 F.3d 772, 774-75 (8th Cir.1995) (striking down 200-foot residential zone); *Vittitow v. City of Upper Arlington,* 43 F.3d 1100, 1105 (6th Cir.), *cert. denied,* 515 U.S. 1121, 115 S.Ct. 2276, 132 L.Ed.2d 280 (1995) ("*Madsen* ... makes clear that any linear extension beyond the area "solely in front of a particular residence' is at best suspect if not prohibited outright."). *See also Douglas v. Brownell,* 88 F.3d 1511 (8th Cir.1996).

Based on the record before us, we conclude that the 200-foot no approach residential buffer zone does not simply proscribe activities directly in front of the staff's residences, but rather operates as a generalized restriction on protesting and thus is unconstitutional. We vacate this portion of the district court's order and remand the case for the district court to reform its preliminary injunction in conformity with *Madsen* and this opinion.

(3) *Clinic and residential blockades*

Paragraph (A)(4) also enjoins defendants from blocking and attempting to block, barricade, or obstruct the entrances, exits, or driveways of the residences of the Clinic staff; and inhibiting or impeding or attempting to impede the free ingress or egress of persons to any street providing the sole access to the residences of Clinic staff. The Court in *Madsen* did not address the provision of the injunction in that case which prohibited defendants from impeding access to streets that provide the sole access to the staff's residences. As a constitutional matter, the restrictions in this case on obstructing the staff's residences and impeding access to the streets serving those residences are not problematic because they burden no more speech than is necessary to serve the State's significant interest in promoting the free flow of traffic on public streets. *See Madsen,* 512 U.S. at 767-69, 114 S.Ct. at 2526. The injunction's prohibition of these activities easily satisfies *Madsen* 's standard. However, this portion of the injunction is vacated as moot to the extent that it applies to the Lucero residence.

(4) *Floating 20-foot buffer zone*

Finally, Paragraph (A)(5) enjoins defendants from knowingly being within 20 feet of Dr. Lucero, his family, and any person seeking to obtain or provide Clinic services. As to Dr. Lucero and his family, this portion of the injunction is vacated as moot. At oral argument, plaintiffs' counsel conceded that the district court erred in including "any person seeking to obtain or provide reproductive health services from or by [plaintiffs]" within the ambit of the floating 20-foot buffer zone. Accordingly, we vacate the injunction in this regard, and remand so that the district court may reform its preliminary injunction. *See Schenck,* --- U.S. at ---- - ----, 117 S.Ct. at 866-67 (indicating that such a floating buffer zone is unconstitutional because it burdens more speech than is necessary to serve the significant government interests).[29]

### III. CONCLUSION

For the foregoing reasons, we affirm in part, vacate in part, and remand for further proceedings.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

---

[29]In *Schenck,* the Court declined to decide "whether the governmental interests involved would ever justify some sort of zone of separation between individuals entering the clinics and protesters, measured by the distance between the two." *Schenck,* --- U.S. at ----, 117 S.Ct. at 867. We likewise need not decide this issue in this case.

We also pause to note that the district court did not have the benefit of *Schenck* 's guidance regarding floating buffer zones at the time the district court issued its preliminary injunction.