[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 18, 2003
THOMAS  K. KAHN
CLERK

_____

No. 02-13131

_____

D. C. Docket No. 00-02679 CV-AR-J

CYNTHIA CAGLE,
as personal representative of the Estate
of Danny Ray Butler, deceased, bringing
claims on behalf of Danny Ray Butler's
heirs and survivors,

Plaintiff-Appellee,

versus

DAVID SUTHERLAND,
in his individual capacity,
ALLEN COLE,
in his individual capacity,

Defendants-Appellants.

----------------------------------------------------------------------------------

_____

No. 02-13651

_____

D. C. Docket No. 00-02679 CV-AR-J

CYNTHIA CAGLE,
as personal representative of the Estate
of Danny Ray Butler, deceased, bringing
claims on behalf of Danny Ray Butler's
heirs and survivors,

                                            Plaintiff-Appellee,

     versus

WINSTON COUNTY,
a county in the State of Alabama,
WINSTON COUNTY COMMISSION,
the governing body of Winston County,

                                          Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Alabama
_____

**(June 18, 2003)**

Before EDMONDSON, Chief Judge, and KRAVITCH and GIBSON*, Circuit
Judges.

_____
\*      Honorable John R. Gibson, United States Circuit Judge for the Eighth Circuit, sitting by
        designation.

PER CURIAM:

This case arises from a suicide at a jail.

Cynthia Cagle, on behalf of the estate of her brother Danny Ray Butler, filed this section 1983 action against Winston County, the County Commission (collectively "Winston County" or "the County"), and various county officials in their individual capacities. Defendants moved for summary judgment. The district court denied summary judgment to Winston County, Sheriff David Sutherland and Jailer Allen Cole but granted it to the other defendants. Winston County, Sheriff Sutherland, and Jailer Cole appeal.[1] Because none of defendants acted with deliberate indifference to Butler's constitutional rights, we vacate the denial of summary judgment and remand with instructions to grant summary judgment to the defendants.

---

[1]The district court amended its order denying Winston County's motion for summary judgment to certify the order for an interlocutory appeal. The district court said the question of whether the constitutional rights of a pretrial detainee can be established by a preexisting consent decree was a controlling question of law. We granted the petition for an interlocutory appeal. Winston County v. Cagle, No 02-90027 (11th Cir. July 5, 2002) (order granting permission to appeal)

Sheriff Sutherland and Jailer Cole may appeal without a section 1292(b) certification because their motions raised the defense of qualified immunity. "The district court's rejection of a qualified immunity defense is a 'final decision under the collateral order doctrine over which this court has jurisdiction pursuant to 28 U.S.C. § 1291.'" Brent v. Ashley, 247 F.3d 1294, 1298 n.3(11th Cir. 2001) (quoting Harris v. Board of Educ., 105 F.3d 591, 594 (11th Cir.1997)).

Although both the County's appeal and Sutherland and Cole's appeal arose from the same litigation and both appeals are from the same order, they came to us as different cases. Because the cases are related and contain similar issues, we have consolidated them for the purposes of this opinion.

BACKGROUND

This case arises out of the suicide of Donnie Ray Butler while he was detained in the Winston County Jail.

A.      The Suicide

Butler was arrested by State Trooper Max Holt for DUI shortly after six o'clock in the evening on 23 September 1999.  Butler had failed a field sobriety test and blew a .162 on an Alcosensor test.  Butler was taken to Winston County Jail by Deputy Bryan Kirkpatrick while Trooper Holt waited for a tow truck.

During the ride to the jail, Butler told Deputy Kirkpatrick that Butler's girlfriend recently hanged herself at the Carbon Hill City Jail.[2]  When they arrived at the Winston County Jail, Officer Mark Taylor prepared to administer an intoxilizer test to Butler.  Butler refused to take the test.  Butler told Officer Taylor about

---

[2]The Carbon Hill City Jail is not the same jail as the one in this case and is not controlled by any defendant in this case.

Butler's friend's suicide and said that the Carbon Hill police department[3] had done

that to her.

After talking with Butler, Officer Taylor spoke to Jailer Cole. Officer Taylor

told Jailer Cole that he should watch Butler and check on him frequently.[4] Trooper

Holt arrived at the jail and started working on the admissions paperwork. He asked

Butler a series of questions on Butler's medical history and mental health. Butler

answered all the questions and did not indicate a history of mental health problems.

Butler did, however, tell Trooper Holt that if Butler had to stay in jail all night, he

would kill himself.

Because Butler was intoxicated, the officers placed Butler in Cell One which

was monitored by a video camera. Deputy Kirkpatrick went to the cell and

removed items that he thought Butler could use to hurt himself, leaving only the

---

[3]No defendant in this case is associated with the Carbon Hill police department.

[4]Jailer Cole claims that he was unaware of Butler's suicide threats and thought he was just supposed to watch Butler because he was intoxicated. Officer Taylor said he told Jailer Cole about the threats. The district court presumed that Jailer Cole was aware that Butler was a suicide risk for the sake of deciding the issue at summary judgment. The district court noted that Jailer Cole was instructed to check on Butler frequently, that he was aware Butler had been placed in Cell One where he could be observed via a video camera, that potentially dangerous items had been removed from the cell, and that Butler's belt and shoelaces had been taken. We agree with the district court's conclusion that it was reasonable to infer Jailer Cole was aware of the suicide risk. At the summary judgment stage, we make reasonable inferences in favor of the nonmoving party. For the purpose of deciding Jailer Cole's appeal, we will infer that Jailer Cole was aware Butler was a suicide risk.

bunk beds and a mattress pad. Meanwhile, because of Butler's suicide threat, Trooper Holt had Butler remove his belt and shoelaces and empty his pockets. Butler was placed in the cell by himself to prevent him from harming someone else or himself. Trooper Holt and Deputy Kirkpatrick asked the inmates in the adjacent cell to watch Butler: A peephole between the cells allowed the inmates to check on each other.

After completing the paperwork, Trooper Holt checked on Butler and left the jail. At 9:00 p.m., Jailer Cole performed a cell check and found nothing out of the ordinary. At 9:30 p.m., Deputy Kirkpatrick left the jail. When Deputy Kirkpatrick left the jail, Jailer Cole was the only county employee remaining at the jail. It was the policy of the Winston County Sheriff's Office to have only one person at the jail at night.[5] At 10:46 p.m. Jailer Cole performed another cell check.[6] Jailer Cole saw Butler "sitting upright against the wall with something hanging from the top bunk

---

[5]Sheriff Sutherland twice had asked the County Commission to provide funding for an additional nighttime jailer. The first request was made in 1995 as a response to a jailbreak. This request was denied. The second request was made in September 1998 because Sheriff Sutherland was concerned about escapes. This request was still pending before the Commission when Butler committed suicide. Funding was eventually granted.

[6]Jailer Cole also testified that he performed a check at 10:30 p.m. and found Butler sitting on the mattress smoking a cigarette. This check was not recorded in the jailer's log book. At the summary judgment stage, disputed facts must be viewed in the light most favorable to the nonmoving party. See Dolihite v. Maughon, 74 F.3d 1027, 1040 (11th Cir. 1996). For the purpose of this appeal, we will assume that Jailer Cole did not perform a check between 9:00 and 10:46 p.m.

around his neck." Jailer Cole immediately went to call Deputy Slocumb and Officer Taylor for assistance.[7]

Officer Taylor arrived at the jail at 10:49, and Deputy Slocumb arrived shortly thereafter. Jailer Cole gave them the cell keys, and they proceeded to Butler's cell. Jailer Cole remained in the office and called an ambulance, Sheriff Sutherland, Chief Deputy Wright, Deputy Kirkpatrick, Trooper Holt and the District Attorney's office. When Officer Taylor reached the cell, he observed that Butler had hanged himself. Butler had used the elastic from his underwear to hang himself. Taylor checked for a pulse, found none, cut Butler down, checked again, and still found no pulse.

Deputy Slocumb observed that Butler was still warm but was cooler than normal to the touch. Neither Officer Taylor nor Deputy Slocumb attempted to resuscitate Butler. The paramedics arrived shortly afterward, and they also did not attempt to resuscitate Butler. Butler was pronounced dead.

---

[7]Jailer Cole did not attempt to cut down Butler because the Winston County Sheriff's policy prevents anyone from entering a jail cell without backup. The policy exists to prevent inmates from attempting to escape by faking suicide or another medical emergency.

B.    The Praytor Order

In the early 1980's the Winston County Jail was involved in a jail-condition lawsuit, Praytor v. Townsend. The complaint focused on jail living conditions and did not mention suicide. In Praytor, the parties reached a settlement; and the district court entered a consent decree adopting the terms of the settlement: Praytor v. Townsend, CV-80-HM-250-S (N.D. Ala. June 8, 1984)[hereinafter Praytor order]. The Praytor order required, among other things, a minimum of two full-time personnel on duty between 5 p.m. and 8 a.m., adequate two-way communication, and hourly prisoner checks. Although both Sheriff Sutherland, who took office in 1995, and the current County Commissioner did not know about the Praytor order, it bound them as successors in interest. The Praytor court made no findings that the conditions in the Winston County Jail were ever unconstitutional or that the order was necessary to prevent constitutional violations.

C.    This litigation

On 22 September 2000, Cagle brought this section 1983 action against Winston County, Alabama, the Winston County Commission, Sheriff Sutherland,

8

Chief Deputy Wright, Deputy Kirkpatrick and Jailer Cole. Defendants moved for summary judgment. The district court granted Chief Deputy Wright's and Deputy Kirkpatrick's motions. The district court said that neither violated the Praytor order and that, therefore, they were entitled to qualified immunity.[8] The district court denied summary judgment to the other defendants because it determined that they violated the mandates of the Praytor order. The district court apparently believed that the Praytor violation equated to a violation of Butler's constitutional rights. The district court also said the Praytor order clearly established the law, defeating Sheriff Sutherland's and Jailer Cole's claims of qualified immunity.

DISCUSSION

We review the denial of summary judgment de novo. LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 834 (11th Cir. 1998). We view the facts in the light most favorable to the plaintiff. Dolihite v. Maughon ex rel. Videon, 74 F.3d 1027, 1040 (11th Cir. 1996). A defendant's entitlement to qualified immunity is a question of law to be reviewed de novo. Id.

---

[8]Cagle does not appeal, and we decide nothing about, the grant of summary judgment to Chief Deputy Wright and Deputy Kirkpatrick.

9

Because Butler was a pretrial detainee, his section 1983 claims are based on the due process clause of the Fourteenth Amendment. Belcher v. City of Foley, Ala., 30 F.3d 1390, 1396 (11th Cir. 1994). "[I]n a prisoner suicide case, to prevail under section 1983 for violation of substantive rights, under . . . the . . . fourteenth amendment, the plaintiff must show that the jail official displayed 'deliberate indifference' to the prisoner's taking of his own life." Edwards v. Gilbert, 867 F.2d 1271, 1274-75 (11th Cir. 1989). The deliberate indifference standard "requires a strong likelihood rather than a mere possibility that the self-infliction of harm will occur." Popham v. City of Talladega, 908 F.2d 1561, 1563 (11th Cir. 1990) (emphasis added). "[T]he mere opportunity for suicide, without more, is clearly insufficient to impose liability on those charged with the care of prisoners." Tittle v. Jefferson County Comm'n, 10 F.3d 1535, 1540 (11th Cir. 1994).

A.     Winston County and the County Commission

To subject a county to liability under section 1983 the plaintiff must show that the constitutional violation occurred as a result of a county policy. Id. "[A] plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action

10

and the deprivation of federal rights." Bd. of the County Comm'rs of Bryan County v. Brown, 117 S.Ct. 1382, 1388 (1997). "[P]roof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably." Id. at 1389.

Cagle argued that the County acted with deliberate indifference when it failed to provide funding for an additional nighttime jailer despite Praytor's requirements and Sheriff Sutherland's requests. The district court determined a reasonable jury could conclude that this inaction was a county policy; that the policy violated the inmates' constitutional rights; and that the violation proximately caused Butler's death. The district court apparently reached this conclusion based on a belief that Praytor defined the constitutional rights of prisoners and detainees in the Winston County Jail. The court rejected the County's arguments that it lacked the funds to pay for an additional jailer, noting "[s]hortage of funds is not a justification for continuing to deny citizens their constitutional rights."

Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws,

11

shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. When evaluating a local government's section 1983 liability "a court 'looks only to whether the municipality has conformed to the requirements of the Federal Constitution and statutes.'" Maine v. Thiboutot, 100 S.Ct. 2502, 2504 (1980) (quoting Owen v. City of Independence, 100 S.Ct. 1398, 1415 (1980)). A consent decree, like the Praytor order, which arises out of a voluntary settlement and is not based upon a finding of -- and is not expressly intended to remedy a -- violation of the Constitution cannot create or expand constitutional rights. See Green v. McKaskle, 788 F.2d 1116, 1123 (5th Cir. 1988)("such orders do not create 'rights, privileges or immunities secured by the Constitution and laws'"); see also Klein v. Zavaras, 80 F.3d 432, 435 (10th Cir. 1996); Martel v. Fridovich, 14 F.3d 1, 3 (1st Cir. 1993); DeGidio v. Pung, 920 F.2d 525, 534 (8th Cir. 1990). Such orders often place requirements on litigants that go beyond the minimum requirements of the Constitution. Because the orders cannot create or expand constitutional rights, a section 1983 claim cannot be based solely on a violation of the order.[9]

---

[9]Consent decrees are court orders and can readily be enforced by contempt citations and the court's inherent powers. Consent decrees are not automatically enforceable through civil actions under section 1983. Because consent decrees are enforceable through contempt, little need exists

Cagle concedes, in her brief, that consent decrees can neither create nor expand constitutional rights. She says, however, that the consent decree can still be relevant to a section 1983 action. She claims that the Praytor order put Winston County on notice of the understaffing problem and, in this sense, that the violation of the order establishes deliberate indifference to the risk of jail suicide. We disagree.

While we accept that the Praytor order is relevant to the deliberate indifference inquiry, its violation, standing alone, does not establish deliberate indifference. It is merely one element in the inquiry. To establish a defendant's deliberate indifference, the plaintiff has to show that the defendant had "(1) subjective knowledge of a risk of serious harm; [and] (2) disregard[ed] . . . that risk; (3) by conduct that is more than mere negligence." McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999). In the case of a county defendant, the plaintiff must point to a policy that demonstrates the County's deliberate indifference. See Tittle, 10 F.3d at 1540 (Counties may be liable for violations of constitutional rights only when such violations occur as a result of an official county policy).

---

to allow suits under section 1983. C.f. Middlesex County Sewerage Authority v. National Sea Clammers Assoc., 101 S.Ct. 2615, 2626 (1981)("When the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983.").

13

Because this case is a jail suicide case, Cagle must show that the County's failure to fund a second, nighttime jailer was deliberately indifferent to a "'strong likelihood, rather than a mere possibility,' that suicide would result from [the County's] actions or inaction." Tittle, 10 F.3d at 1540 (citation omitted). Cagle argues that the Praytor order and Sheriff Sutherland's request for an additional nighttime jailer demonstrate the County's awareness of a strong likelihood for suicide. Neither thing does so.

The Praytor order derived from a jail-condition class action. Suicide was no factor in that litigation. The word "suicide" appears nowhere in the Praytor complaint and nowhere in the Praytor order. Sheriff Sutherland's requests for an additional nighttime jailer were based on his concerns about escape. His requests make no mention of a risk of suicide. These facts fall short of establishing that the County was aware of a strong likelihood of suicide. In addition, no evidence shows that, before Butler, any prisoner had ever committed suicide in Winston County Jail. Nothing in the record required County officials to conclude that commonly prisoners in the Winston County Jail were substantially likely to attempt suicide. See Tittle, 10 F.3d at 1540 ("The plaintiffs cite no authority that supports the argument that the occurrence of two suicides and twenty-seven attempted suicides in the jail requires

14

County officials to conclude that all prisoners of the Jefferson County Jail are substantially likely to attempt suicide.").

The record contains no facts that show the County was truly aware that prisoners in the Winston County Jail were likely to attempt suicide. The County's decision to fund no additional nighttime watcher was not deliberately indifferent to a substantial likelihood of detainee suicide. Popham, 908 F.2d at 1565 (fact that no night guard was on duty at the jail and that the Mayor decided to leave the position unfilled did not establish deliberate indifference).

B. Sheriff Sutherland

Cagle proceeded against Sheriff Sutherland based on his failure to train properly Jailer Cole and the other employees of the jail on suicide prevention; his failure, in violation of the Praytor order, to have two employees at the jail at night; and his failure, also in violation of the Praytor order, to have the cells checked every hour. The district court said that Sheriff Sutherland retained qualified immunity for his alleged failure to train Jailer Cole and the other alleged acts -- or omissions -- not prohibited by the Praytor order. The district court concluded Sheriff Sutherland was not protected by qualified immunity for violations of Praytor.

"Government officials performing discretionary functions are entitled to qualified immunity 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Hartley v. Parnell, 193 F.3d 1263, 1268 (11th Cir. 1999) (quoting Harlow v. Fitzgerald, 102 S.Ct. 2727, 2738 (1982)). Because Sheriff Sutherland was acting within his discretionary authority, our inquiry focuses on two questions, "first . . . whether there is 'an underlying constitutional violation,' [and] second, . . . whether the law the public official is alleged to have violated was 'clearly established' at the time of incidents giving rise to the suit." Taylor v. Adams, 221 F.3d 1254, 1257 (11th Cir. 2000)(citations omitted).

Relying solely on the Praytor violations, the district court answered both questions "yes." As explained above, this approach was error. The Praytor order did not define, create or enlarge Butler's constitutional rights. Therefore, section 1983 liability cannot be established merely because Praytor's terms were not followed. A constitutional violation can only be established if Sheriff Sutherland's policies were adopted with deliberate indifference to a substantial risk of suicide in the jail.

Because Sheriff Sutherland was not at the jail that night and was not involved in the arrest and detention of Butler, his section 1983 liability (like that of the

16

County) must be based solely on his status as a policymaker.[10]  As discussed in relation to the County's liability, no evidence existed that would indicate to policymakers, such as Sheriff Sutherland, that a strong likelihood of prisoner suicides existed in the Winston County Jail.  The jail had no history of suicide, Praytor did not address suicide, and Sheriff Sutherland's own requests for more personnel were not directed at suicide.  Because no evidence shows that Sheriff Sutherland was aware of a strong risk of suicide at the jail, his policy of only having one nighttime jailer cannot be deliberately indifferent to this risk.  See  Popham, 908 F.2d at 1565.

Because Sheriff Sutherland did not act with deliberate indifference to a strong risk of suicide, he did not violate Butler's constitutional rights.  Because no underlying constitutional violation exists, Sheriff Sutherland is entitled to summary judgment.

C.  Jailer Cole

---

[10]Because Sheriff Sutherland is only liable based on his status as a policymaker, he cannot be liable for Jailer Cole's failure to check the cells every hour.  The record clearly indicates that Sheriff Sutherland had an unwritten policy of hourly cell checks.  In her brief, Cagle concedes this hourly check was the policy.

Cagle proceeded against Jailer Cole based on his failure to enter the cell and cut down Butler upon finding him and on Cole's failure, in violation of the Praytor order, to check the cells on an hourly basis.[11]  The district court granted summary judgment to Jailer Cole on his failure to cut Butler down because of qualified immunity.  Again relying on Praytor, the district court decided Jailer Cole was not protected by qualified immunity for his failure to complete hourly checks of the cells.[12]

The law on one point is clear: "A prison custodian is not the guarantor of a prisoner's safety." Popham, 908 F.2d at 1564 (citation omitted).  "Absent knowledge of a detainee's suicidal tendencies . . . [the] failure to prevent suicide has never been held to constitute deliberate indifference." Id.  Because we presume that

---

[11]Whether Jailer Cole was instructed to check the jail every hour or every two hours is disputed. Chief Deputy Wright claims he told Jailer Cole to check the jail every hour consistent with Sheriff Sutherland's policy; Jailer Cole claims he was instructed to check the jail every two hours.  For the sake of deciding Jailer Cole's appeal, we will presume that Jailer Cole was instructed to check the jail every hour.

[12]Cagle argues that Jailer Cole should not be entitled to qualified immunity because he was not performing a discretionary function.  She claims he had no discretion on when to check the jail.  But, we have said that "a government official can prove he acted within the scope of his discretionary authority by showing 'objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority.'" Rich v. Dollar, 841 F.2d 1558, 1564 (11th Cir. 1988)(quoting Baker v. Norman, 651 F.2d 1107, 1121 (5th Cir. 1981)).  Jailer Cole was performing his duties within the scope of his authority, and the district court did not err when it determined that he was acting within his discretionary authority.

Jailer Cole was aware of Butler's suicide threats, we must look to see whether Jailer Cole's acts were deliberately indifferent to this risk.

We conclude that -- under the facts of this case -- Jailer Cole's allowing one hour and forty minutes to elapse between jail checks was not deliberately indifferent. Praytor required the jailor to check the cells every hour. But Praytor did not establish a constitutional right to hourly jail checks, and Praytor was not focused on preventing suicide.

Jailer Cole was aware that Butler's belt, his shoelaces and the contents of his pockets had been confiscated. Jailer Cole was also aware that Butler's cell had been stripped of implements that might assist suicide. While these facts indicated Butler was a suicide risk, they also decreased the risk. These acts show a lack of deliberate indifference on the part of jail personnel and decreased the likelihood that Butler would commit suicide. See Popham, 908 F.2d at 1564. Jailer Cole was not required to foresee that Butler would hang himself with the elastic from his underwear.[13]

Furthermore, Jailer Cole did not ignore Butler. He was instructed to watch Butler, and he did. The record reflects that Jailer Cole observed Butler through the

---

[13] We do not know of -- and the parties do not cite -- any case where another inmate anywhere had committed suicide in the unusual way that Butler did.

19

TV monitor at least every 15 minutes. Closed circuit TV monitoring reflects concern for a prisoner's welfare and a lack of deliberate indifference. Id. The TV camera reached almost all of the cell.[14] "The fact that the camera did not pick up every corner of the cell might be evidence of negligence, but could hardly demonstrate deliberate indifference." Id.

---

[14]In Jailer Cole's deposition, Cagle's lawyer questioned Jailer Cole on how much of the cell was seen by the camera.

> Q.    Could the camera see all of the cell?
>
> A.    It could see almost all of the cell.
>
> Q.    What part of the cell could it not see?
>
> A.    It could not see just below the top bunk on the – if you're facing the cell, the left-hand side of the cell.
>
> Q.    So if someone were in the bottom bunk on the left-hand side of the cell, you could not observe that person?
>
> A.    You could see them, you just could not see maybe from their mid section up if they had been sitting up. If they were laying down, you could observe pretty much every bit of them.
>
> Q.    Okay.
>
> A.    But if they were sitting up with their back against the wall, you could see them and see their movements as far as their hands and feet, but as far as from somewhere midways up, you could not see their face, no.
>
> Q.    From about their waist or their hips up?
>
> A.    Yes.

Assuming that Jailer Cole was aware that Butler had threatened suicide, Cagle points to no evidence establishing that Jailer Cole acted with deliberate indifference to this risk. Jailer Cole did not violate Butler's constitutional rights.[15]

CONCLUSION

The Praytor consent decree did not control this case. No defendant was deliberately indifferent to the risk that Butler would commit suicide. The circumstances, even viewed in Plaintiff's favor, will not support a finding and conclusion of deliberate indifference on the part of Defendants. Butler's

---

[15]Even if Jailer Cole had violated the Constitution, he likely would be entitled to qualified immunity, having violated no clearly established constitutional rights. We are not aware of any of our cases or any case from the United States or Alabama Supreme Courts that would have put Jailer Cole on notice that his acts, given the circumstances, were clearly unconstitutional. Praytor does not do the job; a consent decree like Praytor cannot establish constitutional rights, and obviously it cannot clearly establish constitutional rights. A precedent with materially similar facts is not always required; but for a federal right to be clearly established, the applicable law "'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Hope v. Pelzer, 122 S.Ct. 2508, 2515 (2002)(quoting Anderson v. Creighton, 107 S.Ct. 3034, 3039 (1987)). Here, if Jailer Cole examined the precedents he could reasonably conclude that his conduct -- monitoring via TV cameras (and visiting the cell, at least once, during each hour of the night) an inmate who had been stripped of his belt, shoelaces and so on, and confined in a stripped cell -- was reasonable and was not nearly deliberately indifferent. See Popham, 908 F.2d at 1564. Even if we were to determine that the Constitution required more then Jailer Cole did, we could not say that requirement was already clearly established.

constitutional rights were not violated.  The district court's order is VACATED and the case is REMANDED with instructions to enter judgment in favor of Defendants.

VACATED AND REMANDED.