[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-14567
_____

D.C. No. 1:14-cv-02586-TWT

DONALD GROCHOWSKI, as a representative administrator of the estate of
Kenneth Grochowski, deceased, and, as next of kin to Kenneth Grochowski, and
ADAM GROCHOWSKI, as next of kin to Kenneth Grochowski,

Plaintiffs - Appellants,

versus

CLAYTON COUNTY, GEORGIA, is sued through its chair Jeffrey E. Turner, and
Commissioners in their official capacity, and through the Sheriff Kemuel
Kimbrough, in his official capacity, individually and jointly, KEMUEL
KIMBROUGH, is sued individually, and in his official capacity for actions under
color of law as the Sheriff of Clayton County, individually and jointly, GARLAND
WATKINS, ROBERT SOWELL, and SAMUEL SMITH,

Defendants - Appellees.
_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(June 22, 2020)

Before HULL, MARCUS, and EBEL,* Circuit Judges.

_____

* The Honorable David M. Ebel, Senior United States Circuit Judge for the United
States Court of Appeals for the Tenth Circuit, sitting by designation.

EBEL, Circuit Judge:

This § 1983 action arises out of the death of pretrial detainee Kenneth Grochowski at the hands of his cellmate, William Alexander Brooks, while both men were detained at the Clayton County Jail (the "Jail"). Brooks and Grochowski were both arrested on non-violent charges. Neither man had a history of violent felonies, and neither reported any mental health issues. Both men were classified as medium-security inmates and were assigned to the same cell.

On August 14, 2012, Brooks and Grochowski got into a fight in their cell over a piece of candy. Brooks beat Grochowski until he was unconscious, and then Brooks tried to drown Grochowski in the cell's toilet. Another inmate reported the assault to jail staff, and when staff arrived Grochowski was unresponsive. Grochowski was transported to a nearby medical center and was pronounced dead the following morning.

Grochowski's surviving adult children initiated this civil rights action against Clayton County, Georgia (the "County") and against four supervisors at the Jail—former Sheriff Kemuel Kimbrough, Chief Deputy Garland Watkins,

2

Major Robert Sowell, and Samuel Smith (the "Jail Supervisors").[1] Plaintiffs argued that the conditions at the Jail violated Grochowski's due process rights under the Fourteenth Amendment, and that those conditions caused Grochowski's death. The Jail Supervisors and the County together moved for summary judgment, arguing that the Jail Supervisors were entitled to qualified immunity, and that, under Monell v. Department of Social Services of New York, 436 U.S. 658 (1978), the County was not liable for any alleged constitutional violation. Plaintiffs opposed that motion and moved for partial summary judgment on their claims against the County. The district court entered an order granting the Jail Supervisors' and the County's motion for summary judgment and denying Plaintiffs' motion for partial summary judgment.

Plaintiffs now appeal that order, along with an earlier discovery ruling. Exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM both rulings.

## I.  BACKGROUND

---

[1] Plaintiffs also named as defendants several non-supervisory corrections officers, along with CorrectHealth, LLC ("CorrectHealth") and its employees. CorrectHealth is a private entity that contracts with Clayton County to provide health care at the Jail. At the summary judgment stage, the district court concluded that Plaintiffs had abandoned their claims against the non-supervisory officers and the CorrectHealth employees. The court then granted summary judgment for the entity CorrectHealth. Plaintiffs do not appeal those rulings.

3

Plaintiffs' claims center on the conditions at the Jail.  In particular, Plaintiffs focus on the Jail's process for classifying and housing inmates and on the extent to which double-celled inmates are monitored.

**The Jail's Classification Process**

The Clayton County Jail employs a two-step classification process for new inmates.  First, a healthcare provider either clears the inmate for placement in the general population or recommends another option, such as placing the inmate in the medical infirmary or the mental health infirmary.  If the healthcare provider clears the inmate for placement in the general population, a corrections officer then determines whether the inmate should be placed in minimum-, medium-, or maximum-security housing.  We refer to those processes respectively as the health screening and the security screening.

The health screening follows best practices issued by the National Commission on Correctional Healthcare.  The screening consists of a face-to-face interview between a healthcare provider and an inmate.  During the interview, the healthcare provider asks the inmate about his medical and mental health history, including his use of medications, hospitalizations, head trauma or seizures, suicidal attempts or ideations, violent behavior or victimization, and sexual offenses.  The healthcare provider then conducts a physical assessment of the inmate, which includes assessing the inmate's vital signs,

4

general appearance, attitude, mood, and affect.  In particular, the healthcare provider considers whether the inmate presents as evasive, defensive, guarded, angry, anxious, frustrated, hostile, euphoric, tearful, flat, or blunted.

The healthcare provider also completes a "SAD PERSONS" suicide screening, which generates a score based on indicators like the inmate's sex, age, history of depression, social support, and prior suicide attempts.  A score less than six is considered low-risk for suicide; a score greater than eight is considered high-risk.  If the results of the inmate's health history and physical assessment are within normal limits, the healthcare provider clears the inmate for placement in the general population.  Both Grochowski and Brooks received SAD PERSONS scores of less than six.

The security screening, in contrast to the health screening, does not take place in a face-to-face interview with the inmate.  Rather, a corrections officer relies on records to collect objective data about the inmate, including whether the inmate is currently charged with a violent felony, and whether the inmate has any prior violent felony convictions or any history of behavioral problems at the Jail.  The corrections officer then inputs that data into an Initial Classification Form, which is a standard form that is endorsed by the National Institute of Corrections.  The Initial Classification Form operates as a decision tree based on yes or no answers to nine questions.  For example, if an inmate is

5

currently charged with a violent felony, the decision tree indicates that the inmate should be placed in maximum-security housing.  If an inmate is not currently charged with a violent felony, has no prior violent felony convictions, and has no escape history, the decision tree indicates that the inmate should be placed in medium-security housing.  Both Grochowksi and Brooks qualified under the housing decision tree for placement in medium-security housing.

Inmates are housed according to their security classification.  Certain housing units are designated to house maximum-security inmates; others are designated to house medium-security inmates.  Within those housing units, inmates are placed in particular cells based on available space.

**Jail Design**

The Jail has eight housing units, each with its own central control tower. Each housing unit has six pods and each pod has 16 cells, meaning that each housing unit has 96 cells.

Each cell has a solid door with a small window.  The window measures approximately six inches wide by two or two-and-a-half feet tall.  From the central control towers, officers have a clear view into each pod, but do not have a clear view into each cell. Officers do have a complete view of a cell's interior when they look through the cell door's window from two or three feet away.

6

The National Institute of Corrections does not suggest that a full view of every cell from a remote surveillance booth is necessary; rather, it recommends that remote surveillance booths "have a good view of cell fronts, dayrooms, and mezzanine walkways." The American Corrections Association takes the same position. The National Institute of Corrections, in fact, recommends against large windows on cell doors, as they raise privacy concerns and can cause conflict between inmates who are intentionally housed separately.

The Jail was designed to house two inmates per cell. It is standard practice—nationally and in the state of Georgia—to double-cell medium-security inmates in the general population.

Each cell is equipped with an emergency call button. There are no video cameras inside the cells.

**Jail Staffing**

Each housing unit is staffed with two officers: one guard in the control tower and one on the floor. That staffing plan is consistent with recommendations from the Georgia Sheriffs' Association. Officers conduct physical cell checks every hour and conduct a headcount three times per day at 6 a.m., 6 p.m., and midnight.

**Budget Proposals and Staffing Requests**

One of the Sheriff's duties is to present the County with budget proposals, and the County, in turn, is responsible for funding the Sheriff's operations. Former Sheriff Kemuel Kimbrough ("Sheriff Kimbrough") was elected Sheriff in 2008 and served a term beginning January 1, 2009 and ending December 31, 2012, which included the time of the incident resulting in Grochowski's death. In his budget proposals, Sheriff Kimbrough always requested additional staff, so as to reduce planned overtime and therefore increase safety and efficiency in the Jail.

A former sheriff, Sheriff Stanley Tuggle ("Sheriff Tuggle"), served as sheriff during an earlier time when the Jail was being designed and constructed. Sheriff Tuggle was elected in 1996, took office in 1997, and served until 2005. Sheriff Tuggle oversaw the transition from a previous facility to the Jail after the Jail's construction in 1999. In his 2002 budget proposal, Sheriff Tuggle informed the County that one housing unit was closed due to a staffing shortage. Still, Sheriff Tuggle testified in his deposition that the Jail had enough staff to handle the inmate population at that time, and that it did not have to resort to triple-celling inmates. In August 2012, when Grochowski was killed, one of the Jail's eight housing units was closed. There is no evidence in

8

the record to suggest that either Grochowski or Brooks would have been single-celled even if all housing units at the Jail had been open.

**Arrest and Intake of Brooks**

Twenty-year-old William Alexander Brooks was arrested on July 31, 2012 and charged with theft by receiving stolen property, giving a false name to an officer, driving on a suspended license, and not wearing a seat belt. Brooks was booked into the Jail on August 1, 2012. That day, Brooks underwent a health screening conducted by former defendant, CorrectHealth, LLC ("CorrectHealth")—a private entity that contracts with Clayton County to provide health care at the Jail. During the health screening, Brooks reported no past or current physical or mental health issues and denied any history of violent behavior. CorrectHealth employees noted that Brooks's vital signs, appearance, attitude, and affect were within normal limits. Brooks scored a "1" on the SAD PERSONS suicide screening—the lowest possible score for a male inmate. Brooks was therefore cleared for placement in the general population.

On August 2, 2012, Officer Lashanda Baker performed Brooks's security screening. Brooks's criminal history revealed no violent felony convictions, no escape history, and no past or present institutional behavioral problems. Officer Baker therefore classified Brooks as a medium-security inmate.

9

Plaintiffs point out, however, that Brooks had been convicted in 2009 for misdemeanor fighting, which was not considered under the security screening protocol.

**Arrest and Intake of Grochowski**

Fifty-seven-year-old Kenneth Grochowski was arrested on August 8, 2012 and charged with failure to appear on a DUI charge in Illinois. The same day, Grochowski was booked into the Jail and underwent a health screening conducted by CorrectHealth. CorrectHealth employees cleared Grochowski for housing in the general population. The next day, on August 9, 2012, Officer Baker performed Grochowski's security screening and classified Grochowski as a medium-security inmate.

**The Fight Between Brooks and Grochowski**

Brooks and Grochowski were both placed in Housing Unit 6. Brooks was initially placed in cell 209B, and Grochowski was placed in cell 210B. On August 11, 2012, Officer Paul McKibbins transferred Brooks into cell 210B with Grochowski. Officer McKibbins testified that he had never observed Brooks displaying erratic behavior or acting violently. He knew only that both Brooks and Grochowski had been classified as medium-security inmates. Officer McKibbins placed Brooks in cell 210B with Grochowski because "[i]t just happened [that] . . . at that particular time that space was available."

10

On August 14, 2012, at around 9:05 p.m., Brooks and Grochowski got into an argument over a piece of candy. According to Brooks, Grochowski took a swing at Brooks, and Brooks blocked the swing and hit Grochowski in the throat. Brooks continued to beat Grochowski and then tried to drown Grochowski by placing his head into the cell's toilet. Another inmate alerted jail staff of the assault, and Grochowski was found unresponsive in his cell. Grochowski was transported to Southern Regional Medical Center and was pronounced dead the morning of August 15, 2012.

**Staffing and Cell Checks on August 14, 2012**

On August 14, 2012—the night Grochowski was killed—officers performed hourly cell checks and routine headcounts. That night there were 21 officers, four supervisors, two deputies, and three clerks on shift in the Jail. In Housing Unit 6, one officer was assigned to the control tower and one officer was assigned to the floor.

## II.    DISCUSSION

**A. The Summary Judgment Ruling**

### 1.    Standard of Review

"We review a district court's grant of summary judgment de novo, considering the facts and drawing all reasonable inferences in the light most favorable to the non-moving party." Melton v. Abston, 841 F.3d 1207, 1219 (11th Cir.

11

2016).  "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  Id. (quoting Fed. R. Civ. P. 56(a)).

## 2.    Applicable Law

Plaintiffs brought suit under 42 U.S.C. § 1983 against the Jail Supervisors in their individual capacities[2] and against the County.  Plaintiffs' claims arise under the Fourteenth Amendment's Due Process Clause.  Hamm v. DeKalb Cty., 774 F.2d 1567, 1572 (11th Cir. 1985) (citing Bell v. Wolfish, 441 U.S. 520, 535 n.16 (1979)).  When analyzing claims under the Due Process Clause, the Eleventh Circuit often refers to precedent under the Eighth Amendment's Cruel and Unusual Punishment Clause.[3]  Keith v. DeKalb Cty., 749 F.3d 1034, 1044 n.35 (11th Cir. 2014) (quoting City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983)); see also Cottrell v. Caldwell, 85 F.3d 1480, 1490 (11th Cir. 1996).  The Eleventh Circuit has thus recognized that

---

[2] Plaintiffs also sued the Jail Supervisors in their official capacities.  All but one of the official capacity claims were dismissed, and the district court granted summary judgment for the Jail Supervisors on the remaining official capacity claims.  Plaintiffs do not challenge those rulings on appeal.

[3] Because Grochowski was a pretrial detainee and had not been convicted, he was not susceptible to any criminal punishment as such.  However, he could be confined pending trial, and that confinement necessarily required restrictions on him in a jail setting.  So long as those restrictions have a "legitimate governmental objective" and are not imposed for the purpose of punishment, the Fourteenth Amendment is not violated.  Hamm, 774 F.2d at 1573 (quoting Bell, 441 U.S. at 539).  In this case, Plaintiffs have made no adequate argument that the restrictions upon Grochowski were unrelated to a legitimate governmental objective, so we do not address that issue further.

12

"[a] prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Fourteenth Amendment." Keith, 749 F.3d at 1047 (alteration incorporated) (quoting Marsh v. Butler Cty., 268 F.3d 1014, 1028 (11th Cir. 2001) (en banc), abrogated on other grounds by Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)).  "Whether a risk of harm is substantial is an objective inquiry." Id.  The "deliberate indifference" component is a subjective inquiry that requires a plaintiff to show that the defendants "acted with a sufficiently culpable state of mind."[4] Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004) (quoting Hudson v. McMillian, 503 U.S. 1, 8 (1992)).

### 3.    Claims against the Jail Supervisors

As to the Jail Supervisors, Plaintiffs identify two conditions, which, they argue pose a substantial risk of serious harm to inmates at the Jail.  First, they argue that the Jail's classification process does not adequately identify inmates with violent or assaultive tendencies, which leads to nonviolent inmates being double-celled with violent inmates.  Second, they argue that the Jail's practice

---

[4] Plaintiffs urge us to dispense with the subjective component, as the Supreme Court did in Kingsley v. Hendrickson, 576 U.S. 389 (2015) for excessive force claims arising under the Fourteenth Amendment.  We decline to apply Kingsley because Grochowski's death occurred in 2012 and Kingsley was decided in 2015.  We are not aware of any court that has ruled that Kingsley has retroactive effect.  We therefore do not consider whether Kingsley would otherwise be applicable.

13

of performing hourly rounds is insufficient to ensure the safety of inmates while they are inside their cells.[5]

The Jail Supervisors argue that they are entitled to qualified immunity on these claims. In order to show that an officer is entitled to qualified immunity, the officer must show that he or she was acting within the scope of his or her discretionary authority at the time of the alleged wrongful acts. Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002). There is no dispute in this case that the Jail Supervisors were acting within the scope of their discretionary authority at all relevant times. The burden therefore shifts to the Plaintiffs, who must show, first, that the officers "violated a constitutionally protected right," and second, "that the right was clearly established at the time of the misconduct." Melton, 841 F.3d at 1221. We may address those elements in any order. Id. (citing Pearson v. Callahan, 555 U.S. 223, 236 (2009)). Here, we begin and end our

---

[5] Plaintiffs also raise arguments about the Jail's physical design and its funding levels within their claims against the Jail Supervisors. In Georgia, the Office of the Sheriff (which, in this case, includes the Jail Supervisors) is responsible for the administration and daily operations of the Jail. Purcell ex rel. Estate of Morgan v. Toombs Cty., 400 F.3d 1313, 1325 (11th Cir. 2005). The design of the Jail and the Jail's funding levels, however, are not matters of Jail administration. The record shows that the County worked with an architectural firm to design and construct the Jail in 1999; the Jail Supervisors were not involved in the design process. The record also shows that the Sheriff submits budget proposals to the County, but the County is ultimately responsible for making funding decisions. We therefore restrict our consideration of the Jail's design and its funding to our discussion of the County's liability below.

analysis by concluding that Plaintiffs have failed to show that the Jail

Supervisors violated a constitutionally protected right.[6]

### a. Classification Process

Plaintiffs argue that the Jail's classification process poses a substantial

risk of serious harm because corrections officers do not perform the security

screening in face-to-face interviews with inmates and because the Initial

Classification Form does not account for violent misdemeanors.  As a result,

they argue, violent inmates can be double-celled with non-violent inmates,

which can lead to in-cell assaults.  Plaintiffs argue that if the security screening

had been conducted in person and if it had accounted for violent misdemeanors,

the Jail Supervisors would have identified Brooks as being potentially violent,

particularly in light of his 2009 conviction for misdemeanor fighting.  Plaintiffs

have failed to show, however, that the Constitution requires in-person security

screenings or consideration of violent misdemeanors.

---

[6] We assume that the Jail Supervisors are officers with some supervisory authority at the Jail.  Had Plaintiffs shown that Grochowski's constitutional rights were violated, which they have not done, they would also have needed to show that the Jail Supervisors either "personally participate[d] in the alleged constitutional violation or [that] there is a causal connection between actions of the [Jail Supervisors] and the alleged constitutional deprivation." Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990).  Because we conclude that no constitutional violation occurred, we do not reach that issue.  See Beshers v. Harrison, 495 F.3d 1260, 1264 n.7 (11th Cir. 2007) ("We need not address the Appellant's claims of municipal or supervisory liability since we conclude no constitutional violation occurred.").

15

Plaintiffs cite case law for the proposition that jail classification systems must consider an inmate's capacity for violence.  See Gates v. Collier, 501 F.2d 1291, 1308–09 (5th Cir. 1974).[7]  However, the Jail's classification process does consider an inmate's capacity for violence.  The classification process begins with a health screening, which is conducted according to best practices issued by the National Commission on Correctional Healthcare.  The healthcare screening takes place in a face-to-face interview, during which a healthcare provider asks the inmate if he has any history of violent behavior or victimization.  The healthcare provider also assesses the inmate's appearance, attitude, mood, and affect.  Those measures assist the healthcare provider in determining, in the first instance, whether it is appropriate to place inmates in the general population.

A corrections officer then conducts a security screening based on objective criteria, such as the inmate's current charges, history of violent felony convictions, and any disciplinary records from previous detentions at the Jail.  Those objective criteria are collected on an Initial Classification Form, which is endorsed by the National Institute of Corrections.  The Initial Classification Form functions as a decision tree based on those objective criteria, and it

---

[7] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.  Id. at 1209.

adequately considers an inmate's capacity for violence in determining whether the inmate should be placed in minimum-, medium-, or maximum-security housing.  Plaintiffs have simply failed to show that the Jail's classification system does not adequately consider an inmate's capacity for violence.

### b. Hourly Rounds

Plaintiffs next argue that the Jail's practice of performing hourly rounds is insufficient to supervise double-celled inmates and therefore poses a substantial risk of serious harm to inmates at the Jail.  Plaintiffs have failed to show that the Constitution requires jail officials to conduct rounds more frequently than once per hour.

To the contrary, the Jail Supervisors cite cases to demonstrate that hourly rounds are constitutionally adequate.  In Cagle v. Sutherland, a jail official violated a consent decree from previous litigation that required hourly cell checks.  334 F.3d 980, 985 (11th Cir. 2003).  That official let one hour and forty minutes elapse between cell checks and during that time an inmate died.  Id. at 989.  The court observed that the consent decree "did not establish a constitutional right to hourly jail checks."  Id.  Cagle, then, suggests that even hourly cell checks are not constitutionally required.  See also Popham v. City of Talladega, 908 F.2d 1561, 1565 (11th Cir. 1990) (holding that jail officials were entitled to qualified immunity because the plaintiff "cite[d] no cases for

17

the proposition that deliberate indifference is demonstrated if prisoners are not seen by jailers at all times"). We recognize that Cagle and Popham addressed the subjective component of deliberate indifference rather than the objective component of a substantial risk of serious harm. Still, we think these cases support our conclusion here that the Jail's practice of conducting hourly rounds is constitutionally adequate.

Plaintiffs have failed to show that either the Jail's classification process or its practice of hourly rounds pose a substantial risk of serious harm to inmates at the Jail. Therefore, Plaintiffs have failed to show that those conditions violated Grochowski's rights under the Fourteenth Amendment.[8] Absent any constitutional violation, the Jail Supervisors are entitled to summary judgment on the basis of qualified immunity.[9]

**4.    Claims against the County**

As to the County, Plaintiffs again identify two conditions which, they argue, pose a substantial risk of serious harm to inmates at the Jail. First, they argue that the design of the Jail makes it difficult to monitor inmates in cells,

---

[8] Because Plaintiffs failed to show that the challenged conditions pose a substantial risk of serious harm, we need not also consider whether the Jail Supervisors acted with deliberate indifference to a substantial risk of serious harm.

[9] Absent any violated right, we need not support our qualified immunity conclusion by also considering whether "the right was clearly established at the time of the misconduct." Melton, 841 F.3d at 1221.

18

meaning that in-cell assaults may go undetected.  Second, they argue that the Jail is underfunded and understaffed, which makes it impractical for the officers to conduct rounds more frequently than once per hour.  A county is liable under § 1983 if one of its "customs, practices, or policies" was the "moving force" behind a constitutional injury.  Barnett v. MacArthur, 956 F.3d 1291, 1296 (11th Cir. 2020).  To prevail on such a claim, "a plaintiff must show: (1) that his constitutional rights were violated; (2) that the [County] had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation."  McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing City of Canton v. Harris, 489 U.S. 378, 388 (1989)).  Again, Plaintiffs have failed to show that Grochowski's "constitutional rights were violated."

### a.  Jail Design

Plaintiffs argue that the Jail's design poses a substantial risk of harm to inmates at the Jail because corrections officers do not have a clear view into each cell from the central control towers.  Plaintiffs note that each cell has a solid door with a small window, which is approximately six inches wide by two or two-and-a-half feet tall.  From the central control towers, officers cannot clearly see the interior of a cell through the small window.  This, Plaintiffs argue, puts inmates at a substantial risk of undetected in-cell assaults.

19

Plaintiffs' position amounts to an argument that the constitution requires continuous observation of double-celled inmates. As described above, our precedent undermines that suggestion. See Cagle, 334 F.3d at 989; Popham, 908 F.2d at 1565. What's more, the Jail's design is consistent with national standards. Both the National Institute of Corrections and the American Corrections Association recommend only that officers in remote surveillance booths, like the control towers here, have a good view of cell fronts and walkways. Neither organization recommends that jails install large windows on cell doors to facilitate remote surveillance of a cell's interior. To the contrary, the National Institute of Corrections notes that large windows on cell doors can raise problems such as privacy concerns and increased conflict between inmates who are intentionally housed separately.

We also note that each cell is equipped with an emergency call button, which enables inmates to send an emergency signal to officers in the control tower. This would seem to mitigate risk associated with the small windows on cell doors. And, as discussed above, the Jail accounts for an inmate's capacity for violence when making housing unit assignments. That, too, mitigates the risk of undetected in-cell assaults. Again, Plaintiffs have simply failed to show that the Jail's design is constitutionally deficient.

### b. Funding and Staffing

20

Plaintiffs next argue that the County failed to fund the Jail adequately, leaving the Jail understaffed. Plaintiffs argue that the Jail's staffing levels accommodated only hourly rounds and caused the Jail to close one of its housing units, which remained closed at the time of Grochowski's death. Plaintiffs argue that these conditions posed a substantial risk of serious harm to inmates at the Jail. Again, Plaintiffs have failed to show that the Jail's funding and staffing levels fall below constitutional minima.

As described above, the constitution does not require continuous observation of double-celled inmates. The record shows that the Jail had sufficient staff to perform regular, hourly rounds. Staffing levels were also sufficient to comply with the recommendation from the Georgia Sheriffs' Association that two guards—one in the control tower and one on the floor— monitor each housing unit.

The record also shows that, notwithstanding the closure of one of the Jail's housing units, the Jail was able to house inmates according to its design, with two inmates per cell. There is no evidence that the Jail had to resort to triple-celling inmates as a result of the housing unit closure. Nor is there any evidence that, had the additional housing unit been open at the time of Grochowski's death, the Jail would have opted to single-cell any inmates that ordinarily would have been double-celled. And, of course, even had some

21

inmates been single-celled, there is no evidence that Brooks or Grochowski would have been among those inmates.

The record does show that both Sheriff Kimbrough and Sheriff Tuggle requested additional funding from the County in order to increase staffing and thereby increase efficiency and safety at the Jail.  But Plaintiffs have failed to show that the existing funding and staffing levels posed a substantial risk of serious harm to inmates at the Jail.

Again, Plaintiffs have failed to show that either the Jail's design or its funding and staffing levels violated Grochowski's Fourteenth Amendment rights.  Therefore, the County is entitled to summary judgment.[10]

## B. The Discovery Ruling

In the course of discovery on Plaintiffs' claims against the County, Plaintiffs sought to depose non-party Crandle Bray, former Chairman of the Clayton County Board of Commissioners, regarding his decision-making process with respect to the design and funding of the Jail.  On November 15, 2017, the County filed a Motion for Protective Order, or in the alternative,

---

[10] Absent any constitutional violation, we need not consider whether the County had any "custom or policy that constituted deliberate indifference" to Grochowski's constitutional rights, or whether "the policy or custom caused the violation."  See McDowell, 392 F.3d at 1289.

22

Motion to Quash the Subpoena issued to Bray.  After conducting a hearing, the district court granted that motion.  Plaintiffs challenge that ruling on appeal.

"[W]e will not overturn discovery rulings 'unless it is shown that the District Court's ruling resulted in substantial harm to the appellant's case.'" Iraola & CIA, S.A. v. Kimberly-Clark Corp., 325 F.3d 1274, 1286 (11th Cir. 2003) (quoting Carmical v. Bell Helicopter Textron, Inc., 117 F.3d 490, 493 (11th Cir. 1997)).  Plaintiffs have failed to show that the district court's ruling caused substantial harm to their case.  As described above, Plaintiffs failed to show that the Jail's design or its funding and staffing levels were constitutionally deficient.  Therefore, it would not have aided Plaintiffs' case to obtain information about the County's decision-making process with respect to the Jail's design or funding.  We therefore affirm the district court's order granting the County's Motion for Protective Order.

### III.    CONCLUSION

The district court's order granting the Jail Supervisors' and the County's Motion for Summary Judgment is AFFIRMED.  The district court's order granting the County's Motion for Protective Order is AFFIRMED.

23