[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-11147
Non-Argument Calendar

_____

D.C. Docket No. 1:17-cv-05420-MLB

KENNETH GREENWAY,
As Surviving Spouse of Tammy Sue Greenway as administrator
of the estate of Tammy Sue Greenway,

Plaintiff-Appellant,

versus

SOUTHERN HEALTH PARTNERS, INC.,
NURSE ALYSSA ARMENTI,
DEPUTY CHRISTOPHER A. BOYER,
SERGEANT KENNETH LANGSTON,
SERGEANT JASON MUSE, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(September 15, 2020)

Before NEWSOM, BRANCH, and LUCK, Circuit Judges.

PER CURIAM:

This case arises from the tragic suicide of Tammy Greenway while in custody at the Banks County Jail. Her husband, Kenneth Greenway, brought section 1983 deliberate indifference claims against the officer that arrested the Greenways, Tammy's jailers, the County, the Sheriff, and her medical providers and a state-law negligence claim against the medical providers. The district court granted summary judgment for all defendants, and Kenneth now appeals. Because we conclude, like the district court, that there was no genuine dispute that the defendants did not have knowledge of a strong likelihood that Tammy was a suicide risk or that the County and the medical providers did not cause Tammy's death, we affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Kenneth and Tammy Greenway had a volatile, on-again off-again marriage. They had discussed divorce and had romantic relationships outside of the marriage. Around 2008, Tammy began to have paranoid delusions and became violent towards Kenneth. That year, she attempted suicide by overdosing on pills. Between 2008 and 2015, Tammy suffered from intermittent bouts of mental illness and drug addiction. On December 19, 2015, Tammy kicked in the door to Kenneth's bedroom and attacked him. Tammy was arrested and went to jail for a few days. While in jail, Tammy did not attempt suicide or make any threats of self-harm.

2

On January 23, 2016, Tammy and Kenneth had another violent domestic incident, and a relative called the police. Deputy Christopher Boyer and Sergeant Jim Clay responded.[1] The officers interviewed the Greenways separately and had them fill out witness statements. Tammy wrote that Kenneth attacked her unprovoked and that she did not want further trouble. For his part, Kenneth wrote that Tammy attacked him and threatened to kill him. Deputy Boyer signed off on Tammy's witness statement, and neither witness statement mentioned self-harm or suicide. While discussing the incident with Deputy Boyer, Kenneth told him that

---

[1] We "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." Jackson v. West, 787 F.3d 1345, 1352 (11th Cir. 2015). The parties debate the existence and admissibility of various pieces of evidence that the district court did not consider: 1) statements made by Tammy's daughter, Crystal Beauchamp, and Kenneth at the time of the Greenways' arrest; 2) statements made by Beauchamp's relatives about Tammy's suicide risk; 3) statements documented in a Georgia Bureau of Investigation report about Tammy's death; and 4) testimony about what Kenneth told the jail's nurse. Because we conclude that, even assuming this evidence is properly before us, summary judgment is appropriate, we consider all the evidence presented by Kenneth with the exception of the statements he and Beauchamp purportedly made at the time of the Greenways' arrest.

We agree with the district court that video evidence contradicts Kenneth's assertions that he and Beauchamp told Deputy Boyer at the scene of the arrest that Tammy was suicidal. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record [as with a video recording of the incident], so that no reasonable jury could believe it, a court should not adopt that version of the facts." Manners v. Cannella, 891 F.3d 959, 967 (11th Cir. 2018) (internal quotation marks omitted). Kenneth testified that while he was in the yard with Beauchamp, before Deputy Boyer placed him in the patrol car, he and Beauchamp told Deputy Boyer that Tammy was threatening to hurt herself and that she had attempted suicide before. But the video directly contradicts that testimony. Though Kenneth now contends that the video did not record all of his interactions with Deputy Boyer and parts of it are unintelligible, the video is clear when Kenneth and Beauchamp were talking to Deputy Boyer in the yard before he was arrested. And there is no evidence they told him Tammy was suicidal. Therefore, we will not adopt Kenneth's version of the facts on that point.

3

Tammy was bipolar.  The officers conferred and arrested both Tammy and Kenneth for aggravated assault.

In her interactions with the officers, Tammy did not threaten to harm herself. When Deputy Boyer told her she was going to be arrested, she did not protest or argue with him.  Tammy appeared "fine" to Deputy Boyer.  After the officers arrested both Greenways, Deputy Boyer transported Kenneth to the Banks County Jail, and Sergeant Clay drove Tammy.  After transferring Kenneth to the jail, Deputy Boyer had no further involvement with the Greenways.

Sergeants Kenneth Langston and Sharon Chapman booked Kenneth at the jail. Kenneth told Sergeant Langston that Tammy was suicidal, had attempted suicide previously, and needed to be watched.  Sergeant Langston and Sergeant Chapman also booked Tammy.  Sergeant Chapman did an initial screening of Tammy.  She recorded that Tammy appeared calm and cooperative, was not under the influence of alcohol or drugs, and did not show signs of trauma.  Sergeant Chapman then asked Tammy a series of questions, including whether she had a history of psychiatric treatment, whether she had ever had thoughts of harming herself, and whether she currently had thoughts of harming herself.  Tammy responded "no" to each question. But she reported that she was under a doctor's care and needed various medications. Sergeant Chapman testified that Tammy appeared upset at being arrested but became

4

cheerful after that.  While incarcerated, Sergeant Chapman had a "good rapport" with Tammy, discussed Tammy's new boyfriend with her, and they shared a laugh.

That same day, Sergeant Langston asked Tammy more in-depth questions. That screening included twelve questions regarding suicide risk.  Tammy responded that she had not experienced marital separation, death of a loved one, loss of business, arrest of a loved one, divorce, or major financial loss; she was not a first-time offender and did not have unusual home-family problems; and she had never been in a mental institution or under psychiatric care, had never attempted suicide, and was not currently contemplating suicide.  Sergeant Langston recorded that he did not believe Tammy was a suicide risk.  He also documented that Tammy had issues with thyroid disease, panic attacks, depression, and hormones.  Sergeant Langston testified that Tammy did not say or do anything out of the ordinary.

The next day, while both Greenways remained in jail, Kenneth told one of the jailers, Sergeant Jason Muse, that Tammy was suicidal and needed to be placed on suicide watch.  Kenneth repeatedly tapped on the glass window of his cell to get Sergeant Muse's attention.  Sergeant Muse thought Kenneth was having an anxiety attack and eventually came in with Nurse Alyssa Armenti, who worked at the jail as an employee of Southern Health Partners, Inc., to give Kenneth anti-anxiety medication.  Kenneth also told Nurse Armenti that Tammy had attempted suicide in the past and needed to be on suicide watch.  Sergeant Muse then placed Kenneth on

5

suicide watch and told others he thought Kenneth was "crazy." That same day, Beauchamp called Sergeant Muse and told him that Tammy was suicidal.

On the morning of January 25, 2016, Nurse Armenti conducted a medical screening of Tammy. Tammy reported that she had never considered or attempted suicide. Nurse Armenti similarly observed that Tammy did not exhibit any signs suggesting a risk of suicide, assault, or abnormal behavior in January 2016. Nurse Armenti reported that Tammy was "sweet." Tammy identified her medical conditions as relating to her thyroid and to depression. She had been prescribed a thyroid medicine and an anti-depressant but told Nurse Armenti that she had been without her medications for two weeks and did not bring them with her to the jail. That day, after a consult with the jail's doctor, Nurse Armenti administered Tammy her thyroid medicine and faxed her pharmacy to request her medication records. Tammy did not ask to take an anti-depressant, and Nurse Armenti did not provide one to her, because Tammy had not been taking the medication regularly.

Early in the morning of January 26, 2016, Kenneth made bail. As he left, he and Beauchamp told Sergeant Chapman that Tammy was suicidal. Later that morning, Nurse Armenti went with Sergeant Muse to give Tammy her next dose of thyroid medication. Tammy asked Sergeant Muse if she could have another blanket, but he told her he did not have one to give to her. In response, Tammy refused to

take her medicine and threw it on the ground.  Sergeant Muse then placed Tammy in lockdown in her cell.

While locked down, Tammy screamed and banged on her cell door on and off from 8:30 a.m. to 9:30 a.m.  In the jail's command tower, Officer Tim Brooks observed the banging but saw through the cell's window that Tammy was not trying to hurt herself.  Officer Brooks noticed that Tammy became quiet after about an hour.  At 10:30 am, he talked to Sergeant Muse, who instructed him to have someone check on Tammy.  Officer Brooks asked another inmate to check on Tammy; the inmate looked through Tammy's cell window and screamed.  Officer Brooks radioed Sergeant Muse, who reported to Tammy's cell.  Nurse Armenti also responded to the call.  They found Tammy hanging from a bedsheet.  Nurse Armenti found that Tammy still had a faint pulse.  Sergeant Muse cut Tammy down and helped Nurse Armenti with CPR.  Another officer called an ambulance.  The ambulance took Tammy to the hospital where she was pronounced dead.

Kenneth, on behalf of Tammy's estate, sued Deputy Boyer, Sergeant Langston, Sergeant Chapman, Sergeant Muse, Officer Brooks, jail administrator Captain Scott Rice, Nurse Armenti, Southern Health Partners, Banks County, and Sheriff Carlton Speed under 42 U.S.C. section 1983, alleging deliberate indifference claims under the Fourteenth Amendment.  He also brought a Georgia-law medical

7

malpractice claim against Nurse Armenti and Southern Health Partners. All defendants moved for summary judgment, which the district court granted.

## STANDARD OF REVIEW

We review de novo a grant of summary judgment, applying the same legal standards as the district court. Snow ex rel. Snow v. City of Citronelle, 420 F.3d 1262, 1268 (11th Cir. 2005). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review a district court's decision to keep supplemental jurisdiction under 28 U.S.C. section 1367(c) for abuse of discretion. Lucero v. Trosch, 121 F.3d 591, 598 (11th Cir. 1997).

## DISCUSSION

On appeal, Kenneth argues that: (1) genuine issues of material fact precluded summary judgment for the officers and Nurse Armenti on his deliberate indifference claims; (2) genuine issues of material fact existed regarding whether the County and Sheriff had municipal liability for policies that led to inadequate medical care for Tammy; (3) the district court erroneously exercised supplemental jurisdiction over the state-law medical malpractice claim after dismissing the federal section 1983 claims; and (4) genuine issues of material fact foreclosed summary judgment on his state-law medical malpractice claim.

8

*Deliberate indifference claims*

"[P]retrial detainees . . . plainly have a Fourteenth Amendment due process right to receive medical treatment for illness and injuries, which encompasses a right to psychiatric and mental health care, and a right to be protected from self-inflicted injuries, including suicide." Cook ex rel. Est. of Tessier v. Sheriff, 402 F.3d 1092, 1115 (11th Cir. 2005) (internal quotation marks omitted). "In a prisoner suicide case, to prevail under section 1983 for violation of substantive rights, under . . . the . . . [F]ourteenth [A]mendment, the plaintiff must show that the jail official displayed deliberate indifference to the prisoner's taking of his own life." Edwards v. Gilbert, 867 F.2d 1271, 1274–75 (11th Cir. 1989) (internal quotation marks omitted).

"To establish a defendant's deliberate indifference, the plaintiff has to show that the defendant had (1) subjective knowledge of a risk of serious harm; and (2) disregarded that risk; (3) by conduct that is more than mere negligence." Snow, 420 F.3d at 1268 (alterations adopted). "[I]n a prison suicide case, deliberate indifference requires that the defendant deliberately disregard a strong likelihood rather than a mere possibility that the self-infliction of harm will occur." Cook, 402 F.3d at 1115 (internal quotation marks omitted). "The mere opportunity for suicide, without more, is clearly insufficient to impose liability on those charged with the care of prisoners." Cagle v. Sutherland, 334 F.3d 980, 986 (11th Cir. 2003)

9

(alteration adopted). "Absent knowledge of a detainee's suicidal tendencies, . . . failure to prevent suicide has never been held to constitute deliberate indifference." Popham v. City of Talladega, 908 F.2d 1561, 1564 (11th Cir. 1990). In a deliberate indifference case, "[e]ach individual Defendant must be judged separately and on the basis of what that person knows." Jackson v. West, 787 F.3d 1345, 1353 (11th Cir. 2015).

**Deputy Boyer**: Deputy Boyer responded to the Greenways' domestic disturbance. Kenneth told Deputy Boyer that Tammy had attacked him, threatened to burn down their home, threatened to kill him, was bipolar, and had a drug addiction. Deputy Boyer observed Tammy firsthand after the fight. She appeared "fine" to him, did not protest her arrest, did not threaten to hurt herself, and gave no other indication to Deputy Boyer that she was suicidal. Neither Kenneth's nor Tammy's witness statement made any mention of suicide. And Deputy Boyer did not know that Tammy had attempted suicide in 2008. Though he knew Tammy was bipolar, Deputy Boyer also knew that Tammy would be screened for mental health issues once she arrived at the jail. In any event, "[a]nti-social, aggressive behavioral problems do not rise to the level of a strong risk of suicide." Jackson, 787 F.3d at 1354 (internal quotation marks omitted). Though Tammy was violent, knowledge of "homicidal tendencies" did not give Deputy Boyer belief of "a strong, or any,

likelihood of suicide." See Williams v. Lee Cnty., Ala., 78 F.3d 491, 493 (11th Cir. 1996).

**Sergeant Chapman**: Sergeant Chapman conducted the initial screening of Tammy at the jail. Tammy was calm, cooperative, and cheerful and exhibited no signs of trauma. Tammy told Sergeant Chapman that she had not previously had thoughts of suicide and did not currently have any such thoughts. And Tammy said that she had no history of psychiatric treatment. Sergeant Chapman also testified that she observed Tammy in a holding cell during booking, and Tammy made no attempt to hurt herself. Neither arresting officer told Sergeant Chapman that Tammy was suicidal or mentally ill.

Kenneth and Beauchamp told Sergeant Chapman on January 26 that Tammy was suicidal. By that point, however, Sergeant Chapman had "quite a few conversations" with Tammy that were all positive. She had a good rapport with Tammy and shared a laugh with her. Tammy never asked Sergeant Chapman to see a doctor, sought drugs, exhibited mental problems, or appeared suicidal. Given the screening she conducted, her interactions with Tammy, and her lack of knowledge of any issues with Tammy, we cannot say that one warning by two relatives gave Sergeant Chapman knowledge of a strong likelihood of a suicide risk. See Burnette v. Taylor, 533 F.3d 1325, 1332 (11th Cir. 2008) (holding that a jailer was not

11

deliberately indifferent to the risk of a fatal drug overdose in part because the jailer "observed [the inmate] 'laughing and talking' with his cellmates").

**Sergeant Langston**: Kenneth told Sergeant Langston that Tammy was suicidal, had attempted suicide previously, and needed to be watched. But Sergeant Langston gave Tammy an in-depth screening with numerous questions to gauge any potential for suicide. Tammy reported no previous or current thoughts of self-harm. Though Tammy may have given false answers to some of the questions in the screening, Kenneth has pointed to no evidence to show that Sergeant Langston would think Tammy was lying about not having suicidal thoughts. Sergeant Langston observed that Tammy neither said nor did anything out of the ordinary while he booked her. Tammy also told Langston that she wanted to go live with her boyfriend after her release from jail.

The only knowledge Sergeant Langston had of a suicide risk was Kenneth's statements, but Langston also knew that Kenneth was in jail because of a domestic dispute with Tammy. Placing an inmate on suicide watch requires taking away anything an inmate could use to hurt herself, clothing her in a "turtle" suit that cannot be used for self-harm, and placing her in isolation and under observation. The statements of a domestic violence defendant against his accuser attempting to place her under restrictive and invasive observation would not give Sergeant Langston knowledge of a strong likelihood of suicide. Moreover, Sergeant Langston knew

12

Tammy "had attempted suicide in the past, but [he] did not know when the attempt had taken place . . . [which,] without more, is not sufficient to put [Sergeant Langston] on notice of a strong likelihood rather than a mere possibility that the self-infliction of harm will occur." See Snow, 420 F.3d at 1269. Given Sergeant Langston's screening of Tammy, observation of her behavior, and conversation with her, Kenneth's warning did not give him notice of a strong likelihood of suicide.

**Sergeant Muse**: While incarcerated, Kenneth told Sergeant Muse that Tammy was suicidal and needed to be watched. And Beauchamp and other relatives called the jail and told Sergeant Muse that Tammy was suicidal. The relatives did not explain why they thought Tammy was suicidal or give any other supporting detail. And there is no evidence that Sergeant Muse thought Tammy needed to be under observation. Sergeant Muse believed Tammy did not pose a risk to herself based on the medical team's evaluation and decision to place her in the jail's general population. He also thought that Kenneth was having an anxiety attack when he told Sergeant Muse Tammy was suicidal and that Kenneth was otherwise "crazy."

Sergeant Muse observed Tammy throw down her thyroid medication after being denied an extra blanket. He also knew that she began banging on her cell door when he placed her in lockdown. But Sergeant Muse understood that inmates commonly became upset and acted out when placed in lockdown. And "[a]nti-social, aggressive behavioral problems do not rise to the level of a strong risk of

13

suicide." Jackson, 787 F.3d at 1354 (internal quotation marks omitted). Given Sergeant Muse's knowledge of Tammy's behavior and mental health evaluation and Kenneth's state of mind, neither the relatives' statements nor Tammy's outburst presented Sergeant Muse with a strong likelihood that Tammy would commit suicide. See Snow, 420 F.3d at 1265–66, 1269 (holding that an officer was not deliberately indifferent when he observed a health screening of the inmate that did not report any current suicidal ideation but he knew the inmate was taking prescription medications, had attempted suicide in the past, and was crying and upset at the time).

**Officer Brooks**: Officer Brooks had no contact with Kenneth and had no information about Tammy's mental health status or her medical or arrest history. He knew that Tammy had been put into lockdown and observed her screaming and banging on her cell door for an hour. Though his view into Tammy's cell was limited, Officer Brooks saw that she was not harming herself while banging on the door. Tammy then became quiet in her cell for about an hour, and Officer Brooks had someone check on her. "There is no evidence that [Officer Brooks] suspected that [Tammy] was suicidal." See id. at 1269.

**Captain Rice**: The only evidence linking Captain Rice to Tammy is that a relative told him at the time of her arrest in December 2015 and again in January 2016 that she posed a suicide risk. The relative did not elaborate on the risk or give

14

any supporting information.  Captain Rice knew that the jail had measures instituted by healthcare professionals to screen inmates for mental health issues during the booking process.  And he did not talk with either Kenneth or Tammy while they were incarcerated.  The assertions of suicide risk here by a relative, unsupported by any detail, show only a "mere possibility" of suicide.  See id.  Given that Captain Rice also knew Tammy would be screened for mental health issues, he did not have "notice of a strong likelihood . . . that the self-infliction of harm will occur."  See id.

**Nurse Armenti**: Kenneth brought a slightly different deliberate indifference claim against Nurse Armenti.  He alleged that she acted with deliberate indifference by providing cursory medical care.  The deliberate indifference analysis is the same as that for prisoner suicides.  See Goebert v. Lee Cnty., 510 F.3d 1312, 1327 (11th Cir. 2007).

Kenneth has not met his burden.  He told Nurse Armenti that Tammy was a suicide risk.  But during a medical screening after Kenneth's warning, Tammy told Nurse Armenti that she had never considered or attempted suicide.  And Tammy appeared "sweet" to Nurse Armenti.  Though Nurse Armenti knew about Tammy's previous suicide attempt, she also knew that attempt had occurred four years earlier.  During Tammy's incarceration in 2015, she reported no thoughts of self-harm and did not attempt suicide.  Further, in January 2016, Tammy did not exhibit any signs suggesting a risk of suicide, assault, or abnormal behavior.  Even after Tammy

15

refused to take her thyroid medication, Nurse Armenti testified that she did not think Tammy was experiencing a mental health crisis, posed a danger to herself, or needed to be observed. After Sergeant Muse placed Tammy on lockdown, Nurse Armenti did not see her or hear her banging on her cell door. When she received word of Tammy's suicide, she acted as quickly as possible to access her cell, cut her down, and perform CPR.

Kenneth argues that his expert report provided evidence of deliberate indifference. The expert opined that Nurse Armenti should have taken various actions, such as a more probing mental health screening. But the report offers nothing to show that Nurse Armenti had subjective knowledge of the risk that Tammy would harm herself. The district court did not err in granting Nurse Armenti summary judgment on the deliberate indifference claim.

## *Municipal liability claim*

Kenneth argues that the County and Sheriff Speed have responsibility for Southern Health's policy that led to inadequate medical care for Tammy because Southern Health acted as the County's final policymaker. The County and Sheriff respond that sovereign immunity bars Kenneth's claim as to the Sheriff, but that we need not rule on sovereign immunity because the merits of his municipal liability claim fail in any event. We agree.

16

"Because the Eleventh Amendment represents a constitutional limitation on the federal judicial power established in Article III, federal courts lack jurisdiction to entertain claims that are barred by the Eleventh Amendment." McClendon v. Ga. Dep't of Cmty. Health, 261 F.3d 1252, 1257 (11th Cir. 2001) (citation omitted).  But "sovereign immunity can be waived, [so] our precedent allows us to 'bypass' the threshold question whether an entity is entitled to sovereign immunity where it only 'conditional[ly] assert[s]' the defense." Silberman v. Miami Dade Transit, 927 F.3d 1123, 1137 (11th Cir. 2019) (quoting McClendon, 261 F.3d at 1259).  Because the Sheriff and County urge us to affirm the district court's decision without reaching sovereign immunity, we examine the merits of Kenneth's municipal liability claim.

"A county is liable under [section] 1983 if one of its customs, practices, or policies was the moving force behind a constitutional injury." Grochowski v. Clayton Cnty., 961 F.3d 1311, 1321 (11th Cir. 2020) (internal quotation marks omitted).  "[A] plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004).  "A plaintiff has two methods by which to establish a municipality's policy: identify either (1) an officially promulgated policy or (2) an unofficial custom or practice shown through the repeated acts of a final policymaker for the municipality."

17

Walker v. City of Calhoun, 901 F.3d 1245, 1255 (11th Cir. 2018) (alterations adopted).

Here, Kenneth has not shown any underlying violation of Tammy's constitutional rights. That is dispositive of his claim for municipal liability. See Knight ex rel. Kerr v. Miami-Dade Cnty., 856 F.3d 795, 821 (11th Cir. 2017) (affirming grant of summary judgment for a county and supervising officers because "[t]here can be no policy-based liability . . . when there is no underlying constitutional violation").

Even assuming that he has shown an underlying violation and that Southern Health acted as the County's final policymaker, Kenneth has not pointed to any specific custom or policy that caused Tammy's death. To the contrary, his expert referenced applicable Southern Health policies but opined only that Nurse Armenti had failed to follow these policies. That testimony forecloses any argument that Southern Health had a policy that caused Tammy's death. No causation exists when the policies were not followed. See Snow, 420 F.3d at 1271 ("It is only when the execution of the government's policy or custom inflicts the injury that the municipality may be held liable under section 1983." (internal quotation marks omitted; alterations adopted)). The district court did not err in granting summary judgment for the County and Sheriff.

18

*Supplemental jurisdiction over state law claim*

Kenneth next contends that the district court abused its discretion when it exercised supplemental jurisdiction over his state-law medical malpractice claim after dismissing his federal claims.  If a district court has original jurisdiction over an action, it "shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  A district court, however, "may decline to exercise supplemental jurisdiction" if one of four statutory requirements is met, including after "the district court has dismissed all claims over which it has original jurisdiction."  Id. § 1367(c).

Kenneth, however, never raised the supplemental jurisdiction issue to the district court and has therefore waived it.  "[T]he district court is in the best position to weigh the competing interests . . . in deciding whether it is appropriate to exercise supplemental jurisdiction," and it should have the chance to exercise its discretion "in the first instance."  Lucero, 121 F.3d at 598.  Without the district court's ruling on the matter, "[i]t would be difficult for us to review the issue."  Id.  For those reasons, we will not "overlook [Kenneth's] failure to present [his section] 1367(c) arguments to the district court."  See id.

19

*State-law medical malpractice claim*

Finally, Kenneth argues that the district court erred in finding no genuine dispute of fact on the causation element of his medical malpractice claim. Kenneth alleged that Nurse Armenti was negligent in her care of Tammy and Southern Health had respondeat superior liability.

"In order to prove medical malpractice in Georgia," a plaintiff must show "(1) the duty inherent in the health care provider-patient relationship; (2) breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure is the proximate cause of the injury sustained." McDowell, 392 F.3d at 1295. "In order to establish proximate cause by a preponderance of the evidence in a medical malpractice action, the plaintiff must use expert testimony . . . ." Zwiren v. Thompson, 578 S.E.2d 862, 865 (Ga. 2003). "Instead of speaking in terms of possibilities, the expert's testimony must show as an evidentiary threshold that the expert's opinion regarding causation is based, at the least, on the determination that there was a reasonable probability that the negligence caused the injury." Id. (internal quotation marks omitted). "An expert may satisfy this requirement in one of several ways, including testimony that the only apparent cause of the plaintiff's injury was the defendant's action" or testimony that "based upon the expert's extensive experience in the field, that, in the absence of the alleged negligence, the

20

patient's condition could have been prevented from worsening." Swint v. Alphonse, 820 S.E.2d 312, 317 (Ga. Ct. App. 2018) (internal quotation marks omitted).

Here, Kenneth's expert offers nothing more than the possibility that Nurse Armenti proximately caused Tammy's death. The expert testified generally that Tammy's death was preventable and that the County's and Southern Health's policies were not followed. Those opinions do not show that Nurse Armenti caused Tammy's suicide. The expert does offer more specific opinions tied to Nurse Armenti, including that she should have consulted the jail doctor given Tammy's history of mental illness, caused Tammy to run out of her medications by not returning them when Tammy was released from jail in 2015, failed to notify jail staff about Tammy's special health needs, and delayed inappropriately in responding to the suicide. These opinions go to Nurse Armenti's negligence, but none of them provide any testimony that there was a reasonable probability Nurse Armenti's purported failures caused Tammy's death.

Moreover, as the district court pointed out, the expert testified in his deposition that Nurse Armenti's actions did not cause Tammy's suicide. He said that, though Nurse Armenti caused Tammy to run out of her medication, she would not have suffered withdrawal from her medications while incarcerated in January 2016. He also testified that a few extra doses of Tammy's anti-depressant would not have affected the outcome. Nurse Armenti's mental health screening was deficient,

21

said the expert, but it did "not proximately" cause Tammy's suicide and a more searching screening would "not necessarily" have indicated a suicide risk. The expert thought it was "purely hypothetical" that Tammy would have been fine had Nurse Armenti given her an extra blanket. And the expert could not conclude that it was "more likely than not" that Nurse Armenti's response to Tammy's hanging caused her to die. The district court did not err in granting summary judgment on that basis. See Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1304 (11th Cir. 2009) (Under Georgia law "if the plaintiff medical expert cannot form an opinion with sufficient certainty so as to make a medical judgment, there is nothing on the record with which a jury can make a decision with sufficient certainty so as to make a legal judgment."). And because the evidence did not show that Nurse Armenti caused Tammy's death, Kenneth cannot hold Southern Health liable under a theory of respondeat superior. See Trabue v. Atlanta Women's Specialists, LLC, 825 S.E.2d 586, 584 (Ga. Ct. App. 2019) ("[W]here a defendant employer's liability is entirely dependent on principles of vicarious liability, such as respondeat superior, . . . a verdict exonerating the employee also exonerates the employer.").

## CONCLUSION

Deliberate indifference cases present "a difficult burden for a plaintiff to meet," Popham, 908 F.2d at 1563, and Kenneth has not met it here. He failed to establish a genuine issue of fact that any defendant had knowledge of a strong

likelihood that Tammy would commit suicide.  He also did not show a genuine dispute that the County and Sheriff had an unconstitutional policy that caused Tammy's death or that Nurse Armenti's negligence caused Tammy's death.  And he never objected to the district court's exercise of supplemental jurisdiction.  For these reasons, we affirm the district court's grant of summary judgment.

**AFFIRMED.**